[Civil No. 3076.   Filed January 13, 1932.]

[6 Pac. (2d)  902.]

SIDNEY P. OSBORN, Doing Business as "DUN-BAR'S WEEKLY," and H. C. GILBERT, A. G. AUSTIN and B. M. ATWOOD, as Members of and as the Board of Supervisors in and for Maricopa County, Arizona, Appellants, v. P. R. MITTEN and C. A. MITTEN, in Their Own Behalf and in Behalf of Others Similarly Situated, Appellees.

Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Appellant Osborn.

Mr. Lloyd J. Andrews, County Attorney, and Mr. Dudley W. Windes, Deputy County Attorney, for Appellant Board of Supervisors.

Mr. Frank W. Beer and Mr. Arthur E. Price, for Appellees.

ROSS, J.—This is an action by P. R. Mitten and C. A. Mitten, as taxpayers of Maricopa county, brought to enjoin the board of supervisors of said county from carrying out a contract for the county advertising, publications and printing for the year 1931, entered into by the board with Sidney P. Osborn, doing business as ''Dunbar's Weekly,'' a newspaper, who is also made a party defendant. After a hearing upon the question as to the validity of the board's action in awarding the contract to Osborn, the prayer of the plaintiffs was granted, and the board was enjoined from giving the county printing to Osborn for publication. Thereafter the board and Osborn gave notice of appeal, and Osborn filed a *supersedeas* bond, whereupon the court suspended the operation of its judgment pending the outcome of the appeal.

The board advertised a call for bids for the county advertising, printing and publications, and in response thereto received ten bids, from the ten newspapers hereinafter named, offering to do the county advertising, printing, and publishing during 1931, for the following sums per inch per insertion, to wit:

|  | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| Chandler Arizonan | .19 | .19 | .19 | .19 |
| Subsequent insertion | | .09 | .09 | .09 |
| Buckeye Review & Weekly Times | .20 | .20 | .20 | .20 |
| Glendale News | .21 | .21 | .21 | .21 |
| Mesa Journal-Tribune | .24 | .24 | .24 | .24 |
| Subsequent insertion | | .10 | .10 | .10 |
| The Messenger | .30 | .30 | .30 | .30 |
| Subsequent insertion | | .25 | .25 | .25 |
| Arizona Weekly Gazette for first three insertions | .34 | .34 | .34 | .34 |
| Subsequent insertions | .29 | .29 | .29 | .29 |
| Dunbar's Weekly | .40 | .40 | .40 | .40 |
| Arizona Labor Journal, two insertions | .45 | .42 | .42 | .42 |
| Three or more | | | .40 | .40 |
| Phoenix Gazette | .70 | .70 | .70 | .70 |
| Arizona Republic | .90 | .90 | .90 | .90 |

These bids were opened by the board on December 15, 1930. On December 19th the board accepted (two members voting for and one against) the bid of "Dunbar's Weekly," and thereafter, on December 23, 1930, the chairman and clerk of the board duly executed a contract in favor of "Dunbar's Weekly," for the county's advertising, printing and publications for the year 1931 at the price named in its bid.

It is contended by plaintiffs that the board's action in awarding the contract to "Dunbar's Weekly" was arbitrary, illegal, fraudulent, extravagant and wasteful of the public moneys, and was taken without any investigation whatsoever into the responsibility of the respective bidders.

On the contrary, it is insisted by the board of supervisors and Osborn that the board did investigate the responsibility of the bidders, and did determine therefrom that the bid accepted by them was the lowest responsible bid, and that, no fraud appearing, the award cannot be set aside or vacated by the courts.

The manner of letting contracts for the county's advertising, publications and printing is provided for by section 778, Revised Code of 1928, reading as follows:

"The board of supervisors shall let all advertising, publications and printing required or authorized to be made by them, by contract, annually. Written notices of the letting of such contract shall be deposited in the post office by the clerk of the board, postage prepaid, addressed to the office of each newspaper within the county, at least ten days prior to the opening of bids, calling for written bids for the advertising and publications and printing to be made during the ensuing year by the county, and stating on what day the bids received will be opened. The contract shall be made with the lowest responsible bidder within the legal rate; and to him shall be given thereafter during the existence of the contract all adver-

tising, publications and printing ordered made by the board upon the terms and conditions of the contract. The paper of such advertising may be referred to as the official paper of the county.''

All bidders were at the time newspapers located, issued and circulated in Maricopa county, the ''Messenger,'' ''Arizona Labor Journal,'' ''Arizona Weekly Gazette,'' ''Phoenix Gazette'' and the ''Arizona Republic'' in Phoenix, and the others in the towns indicated by their names, and were all qualified to do public printing as provided in section 2744 of the Revised Code, that is, they had been established, published, and circulated within the county and state for at least one year prior to the bid.

It is obvious that the agents of the county entrusted and empowered by the law to let the contract for its public printing did not give such contract to the lowest bidder, there being six bids lower than ''Dunbar's,'' one for one-half and one for less than one-half of ''Dunbar's'' bid, and four others considerably lower. It is also obvious that the law does not require that the contract be let to the lowest bidder, but that it does require that it be let to the lowest responsible bidder, and imposes the duty of determining that question upon the board of supervisors. Pecuniary ability is hardly ever determinative of responsibility. It is of course essential, but in addition thereto we think the board had the right to take into consideration in awarding the contract the bidder's facilities for doing the work, as also his or its skill, capacity, experience and integrity (*Williams* v. *City of Topeka*, 85 Kan. 857, Ann. Cas. 1913A 497, 38 L. R. A. (N. S.) 672, 118 Pac. 864), and, in a case of this kind, perhaps the accessibility of the bidder's plant to the officers who furnish the material to be printed, advertised or published, when not expressly or by implication prohibited from so doing.

Granting that all of the elements enumerated enter into the bidder's responsibility and that their presence or absence are matters for the determination of the board, there exists a duty upon the members of the board to make an investigation of all bidders before they can form an intelligent and sound opinion as to their fitness and qualifications to do the work. Without such investigation an award must necessarily be arbitrary and capricious. But if after an honest and fair investigation of the fitness and qualifications of the lower bidders they are found lacking in responsibility, as defined, the board's determining that a higher bidder is the lowest responsible bidder is not arbitrary or capricious, but the exercise of a sound discretion which will not be disturbed by the courts.

The bidder to whom the contract must be let is "the lowest responsible bidder." This language is mandatory, and, if not followed, makes a farce of the law requiring a county's contracts to be let upon competitive bidding. As between bidders equally responsible, the board cannot reject the lowest bid. 44 C. J. 111, § 2208.

This brings us to a consideration of the kind of investigation made by the board and its sufficiency under the law to justify the letting of the contract to "Dunbar's Weekly," whose bid was higher than six others.

The plaintiffs' case was made solely upon the testimony of the members of the board of supervisors and the clerk thereof, and necessarily so because they were the only persons who knew the character and extent of their investigation, they not having made a record of their investigation or their reasons for awarding the contract to "Dunbar's."

Phil C. Ensign, a member of the board, testified that one of the reasons the contract was let to "Dun-

bar's Weekly'' was that it ''has a circulation over the county and (is) not a local affair . . . and has a circulation over the newsstands . . . and the Chandler paper is outside of the city''; that only one of the papers of the lower bids was sold on the news-stands he went to (3); that ''Dunbar's Weekly'' had done the county printing in 1930 and it was very satisfactory; that a paper out of the city would handicap the printing in a legal way. He further testified:

''Q. Did you investigate the financial responsibility of any of the bidders? A. No, I had no way of doing that.

''Q. Did you investigate their ability to publish these notices regularly throughout the year and their equipment for publishing and printing these papers? A. No, I didn't do that. . . .

''Q. Did you make any investigation as to the financial responsibility or the ability and skill as publishers and printers of any other of the lower bidders? A. No, not that part of it.''

He further said that he thought ''Dunbar's'' bid was the best one for the county ''because it has a county circulation.''

H. C. Gilbert, chairman of the board, testified, when asked why he had awarded the contract to ''Dunbar's,'' that he had done so for ''various reasons,'' ''first the service and publicity.'' He explained under ''service'' that the ''Weekly Gazette'' had had the contract one year and that the service was very unsatisfactory; that ''Dunbar's'' always gave good service; that it was found on the news-stands, ''and if you want to know I will tell you frankly I think the paper ought to be published in the county seat.'' When asked if he had investigated the other bidders he said it was not his business to make that kind of investigation. He further said he did not think ''the statute requires us to investigate the standing of these papers.''

A. G. Austin, also a member of the board, testified that he voted to award the contract to the "Chandler Arizonan," believing it was the lowest responsible bidder. This witness said none of the bids was discussed except "Dunbar's" and the "Chandler Arizonan's."

The clerk of the board, C. L. Walmsley, said that he had various conversations with the board about the various bids, in which the discussion was principally as to the service and the fact that some of the papers had no subscription list to amount to anything. When asked as to the service they had been getting, he said he didn't hesitate to tell the members of the board that "Dunbar's" had given wonderful service.

From the very limited and restricted investigation, as indicated by the testimony, the members of the board, in effect, assigned the following reasons for letting the contract to "Dunbar's Weekly": (1) That it is published in Phoenix; (2) sold from the news-stands; and (3) rendered good service as the official paper for the year 1930.

Now, taking up the first reason we find that the law does not favor a newspaper published in the county seat over those published elsewhere in the county. We draw this conclusion from the fact that section 778, *supra,* makes it the duty of the clerk of the board of supervisors to mail written notice to each news-paper published within the county at least ten days prior to the opening of bids for the county printing, stating the day bids will be opened, and following this direction is the statement:

"The contract shall be made with the lowest re-sponsible bidder within the legal rate."

It will not be amiss in this connection to state that the only notice provided for in section 778, *supra,* is the one required to be mailed by the clerk of the board of supervisors to "each newspaper within the

county"—a selected class. It is not required that an advertised call for bids be published, as is required by section 777 when calling for bids for books, stationery and supplies for county institutions, the erection, alteration or repair of county buildings, etc., or by section 2748 when calling for bids to publish the minutes of the board of directors of state institutions and the state board of equalization. The restricted notice required by section 778 is strong evidence that the legislature intended that the board of supervisors should select to do the county printing the lowest responsible bidder from the class qualified to bid, regardless of its or his location in the county. We suggest there would be no reason to notify all newspapers in the county of the call unless it was intended they should have the privilege of bidding and contracting for the work. The legislature did not consider location in the county seat an element of qualification or responsibility. But, even if it were, the "Messenger" is published in Phoenix and had a lower bid than "Dunbar's." It was not considered.

The second reason may show there was a greater demand for "Dunbar's" than for the papers of the lower bidders, but it is not conclusive evidence that it had a more general or greater circulation than the others. Probably the legislature should have made the extent of circulation a consideration in awarding the contract, but it has not done so. So the second reason is not made by the statute an element of responsibility or eligibility to have the contract. If the newspaper is published in the county and is otherwise qualified, it is eligible to contract for the printing. Section 2744, *supra*.

The third reason is no doubt a valid one, but, because "Dunbar's" gave wonderful service as the official paper in 1930, it does not follow that the lower bidders were not responsible and able to give wonderful service also.

The trial court based its judgment in enjoining the contract upon insufficient investigation, and we think rightly so. Apparently the only bidder whose responsibility the board investigated or was interested in or had personal knowledge of was "Dunbar's." In short, they knew "Dunbar's" service the year before was satisfactory; that its plant was located in Phoenix; that its paper sold from the news-stands; and that it was responsible. They made no investigation as to the responsibility of the lower bidders, and apparently had no knowledge thereof except as to the "Weekly Gazette" and the "Glendale News," both of which had been the official paper of the county, the former rendering unsatisfactory and the latter satisfactory service.

In *People* v. *Gleason*, 121 N. Y. 631, 25 N. E. 4, where the charter of Long Island City required that contracts for work and supplies should "be let to the lowest responsible bidder giving adequate security," the common council was held to be without power to give the contract to the higher bidder, there being no showing that the lower bidder was not responsible, nor his security inadequate, nor any pretext to that effect. It was there said, in answer to the contention that the action of the common council was conclusive:

"The claim is made on behalf of the relator that there is a conclusive presumption that the common council adjudicated that his bid was that of the lowest responsible bidder. If this claim be well founded, then provisions like that above quoted from the city charter are of little use, and they can always be effectively disregarded and violated. It is true that the common council, where there are several bidders, have jurisdiction to determine who is the lowest responsible bidder; but in order to give its action any legal effect it must exercise its jurisdiction, and make a determination based upon some facts. If it refuses to accept the lowest bid for work or supplies,

there must be some facts tending to show that it is not that of a responsible bidder, or there must be at least some pretense to that effect. An arbitrary determination by such a body to accept the highest bid, without any facts justifying it, cannot have the effect of a judicial determination, and must be denounced as a palpable violation of law." See, also, *St. Landry Lumber Co.* v. *Mayor and Board of Aldermen,* 155 La. 892, 99 South. 687; 44 C. J. 111, § 2208.

It seems to us that the above is a fair and reasonable rule to apply to the conduct of the county's agents in awarding contracts under section 778, *supra.* The reason for requiring the board to mail written notice of the letting of contract to all the newspapers of the county is that the county's advertising and printing may be had and done at a reasonable and fair cost to the taxpayers. Competitive bidding by those competent and eligible to do the printing is the method adopted to attain that end. Now, this legislative scheme to prevent the plundering of the táxpayers also has the virtue of giving the newspapers of the county an equal opportunity. This at least is theoretically true, and we think the law should be administered by the board so as to make it practically true. But, if the board can do what was done in this case, neither the taxpayer nor the lowest responsible bidder has received the protection or treatment the legislature intended to throw around them. So far as the record shows, all the lower bidders, with perhaps one exception, were just as responsible as "Dunbar's Weekly." The board simply ignored them and their bids and accepted the bidder that had done wonderful service for the county the year before. There was no fair *bona fide* investigation and determination of the responsibility of the respective bidders. The board might just as well have given the contract to the "Arizona Republic" at 90¢ per inch per insertion.

The appellants cite *Seventh-Day Adventists Publishing Assn.* v. *Board of State Auditors,* 116 Mich. 672, 75 N. W. 95, as sustaining the action of the board of supervisors in awarding the contract to "Dunbar's Weekly." The opinion in that case is very brief. It is based entirely upon the complaint and answer. The controlling statute is not referred to. The holding was to the effect that the board of state auditors might take into consideration the distance of the bidders' places of business from the place of doing the work, the additional expense and delay entailed in consequence thereof, and the facilities of the respective bidders for doing the work in estimating which was the lowest bidder. Granting that the statute was the same as ours, there is no substantial evidence here of any additional expense in publishing the county's printing outside of Phoenix, or that there would be any material delay, or that the facilities of "Dunbar's Weekly" were better than the lower bidders. It is a matter of common knowledge that with Maricopa county's paved roads and the modern means of travel all of the county's newspapers published outside of Phoenix can be reached inside of twenty-five or thirty minutes, except the one at Buckeye, and that it can be reached in an hour, and all are connected by telephone. The delay and expense, if any, could not therefore be very much.

Nor do we think *State* v. *Snively,* 175 Minn. 379, 221 N. W. 535, and *Leavy* v. *City of Jackson,* 247 Mich. 447, 226 N. W. 214, sustain appellants' contention. In both cases the statutes reserved the right in the municipal authorities to reject any and all bids. In the latter case the governing rule is quoted from 3 McQuillin's Municipal Corporations, second edition, author's note, page 919, as follows:

" 'Reservation of right to reject any and all bids, where the authorities have power to make such reser-

vation, gives the right to let the contract to any bidder and reject the others, although the one securing the contract is not the lowest bidder; provided, the authorities act in good faith in the exercise of an honest discretion.' ''

Our statute does not authorize the board to reject any and all bids. It is true that in their advertised call for bids they inserted such a provision, but we do not think that such insertion has the effect of a statute. They could, of course, reject all bids whether such reservation was put into the advertisement or not if they concluded that none of the bidders was responsible or that all of the bids were exorbitant or excessive; but, if the board is satisfied that bids are reasonable and fair and proceed to award the contract, they must let it to the lowest responsible bidder.

It seems to us that the board of supervisors in failing to investigate and consider the responsibility of the bidders whose bids were lower than ''Dunbar's Weekly'' acted arbitrarily and not in the interests of the taxpayers; that the court was right in enjoining the carrying out of the contract, and that therefore the judgment must be affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.