[Civil No. 3795.   Filed April 26, 1937.]

[67 Pac. (2d) 483.]

PRESCOTT COURIER, INC., a Corporation, and BERT TILTON, Appellants, v. BOARD OF SUPERVISORS OF YAVAPAI COUNTY, and WM. BYERS, T. B. JONES and CLARENCE C. JACKSON, Members of Said Board, and DAVID H. BILES, County Treasurer of Yavapai County, and J. W. MOXLEY, Appellees.

Messrs. Favour & Baker, for Appellant Prescott Courier, and Mr. A. M. Crawford, for Appellant Tilton.

Mr. Charles L. Ewing, County Attorney, and Mr. E. C. Locklear, his Deputy, for all appellees except J. W. Moxley.

LOCKWOOD, J.—This is an action by Prescott Courier, Inc., a corporation, hereinafter called plaintiff, against the Board of Supervisors of Yavapai County and the treasurer of said county, hereinafter called defendants, praying that a certain contract made by the county with J. W. Moxley, hereinafter called intervener, be declared null and void, and that the supervisors and the treasurer be enjoined from

making any payments thereon. The case was tried to the court sitting without a jury, and judgment was rendered in favor of the defendants, whereupon this appeal was taken.

The facts involved are not in dispute, and the question is one of the law applicable to those facts. We state them as follows: In the spring of 1936, the Board of Supervisors of Yavapai County decided to purchase certain election supplies necessary for use in the primary and general elections which were to be held that fall. They sent by registered mail to the Prescott Courier (plaintiff herein), the Prescott Printing Company, which was in effect intervener Moxley, and the Verde Copper News, a notice of a call for bids for such supplies. This notice requested bids for the printing of all election blanks and supplies required by the county for the period of a year, there being twenty-one items mentioned in the call. Request was made for a bid of a stated price per hundred and per additional hundred for each of these items separately, with the exception of one which called for prices for twenty-five, fifty, and one hundred. Nothing was said in the call as to how many of each item would be required by the county. In pursuance of this call, bids were presented by plaintiff and by the Prescott Printing Company. On some of these items plaintiff's bid was high, while on others it was low. The board examined the bids carefully and finally awarded a contract to the Prescott Printing Company for all of the supplies. Thereafter this action was brought, plaintiff claiming that neither the notice of the call for bids nor the award on the bids complied with the law.

■ There are four assignments of error raising, in effect, three propositions of law, which we will consider as seems advisable. The first is as to the sufficiency of the notice for bids. It is the contention of

plaintiff that notice of the call for bids should have been given under the provisions of section 777, Revised Code of 1928, while it is the position of defendants that either the notice set forth in section 778, Revised Code of 1928, as amended (by Laws 1933, chapter 75, section 1), is the one required, or else that no notice whatever was necessary. These sections as they appear in the Revised Code of 1928 read as follows:

"§ 777. *Contract for supplies and buildings; competitive bids.* All books, stationery, and supplies for county institutions for the ensuing year, and all erections of, repairs to and alteration in any county building exceeding in value the sum of one hundred dollars, shall be let by contract, after advertisement made for bids therefor for not less than ten days nor more than four weeks in the official paper of the county. Such advertisements shall state that sealed bids will be received at the office of the board of supervisors until a date therein named, the nature of the bids, and that specifications therefor may be seen at the office of said board; or, it may call for specifications and bids. The board shall let the contract to the lowest bidder, or may reject all bids and re-advertise."

"§ 778. *Advertising and printing by annual contract.* The board of supervisors shall let all advertising, publications and printing required or authorized to be made by them, by contract, annually. Written notices of the letting of such contract shall be deposited in the post office by the clerk of the board, postage prepaid, addressed to the office of each newspaper within the county, at least ten days prior to the opening of bids, calling for written bids for the advertising and publications and printing to be made during the ensuing year by the county, and stating on what day the bids received will be opened. The contract shall be made with the lowest responsible bidder within the legal rate; and to him shall be given thereafter during the existence of the contract all advertising, publications and printing ordered made by the board upon the terms and conditions of the contract. The paper of such advertising may be referred to as the official paper of the county."

—and are substantially in the same form as they were in the Codes of 1901 and 1913. Shortly after the Revised Code of 1928 went into effect, this court decided the case of *Prescott Courier, Inc.,* v. *Moore,* 35 Ariz. 26, 274 Pac. 163. This involved a construction of paragraphs 2422, 2423, and 2424, Revised Codes of Arizona 1913 (Civ. Code), which, in substance, were the same as section 778, *supra.* By the terms of the call for bids in the case cited, the supervisors attempted to limit the bids for printing of every kind authorized to be contracted for by the board of supervisors to newspapers of the character set forth in paragraph 4657, Revised Code of Arizona 1913 (Civ. Code), carried forward in substance in the Revised Code of 1928 as section 2744. We held that such a call for bids was unconstitutional, under the provisions of section 13, article 2, and subdivision 13 of section 19, article 4, of our Constitution, in that it attempted to limit the right to bid on a contract for job printing to newspapers of a certain class, and to deny it to other printing establishments equally well qualified to do the work. In the later case of *Osborn* v. *Mitten,* 39 Ariz. 372, 6 Pac. (2d) 902, decided in January, 1932, the question arose as to whether boards of supervisors might let contracts for county advertising and publications to any other qualified newspaper than the lowest responsible bidder, and we held that they could not, the board having no discretion excepting to determine that the lowest bidder was also a responsible one. In 1933, for some reason not appearing upon the face of the record, the legislature decided that section 778, *supra,* under which all county advertising, publications, and job printing had theretofore been let, required changes, and it was amended by chapter 75, Session Laws of 1933 (section 1), to read as follows:

"The board of supervisors shall let all advertising, publications and printing required or authorized to be done or made by them, by contract annually. Written notices of the letting of such contract shall be deposited in the post office by the clerk of the board, postage prepaid, addressed to the office of each qualified newspaper within the county, at least ten days prior to the opening of bids, calling for written bids for the advertising and publications to be done or made by the county during the ensuing year, and stating on what day the bids received will be opened. The contract shall be made with the lowest and best bidder, in the discretion of the board, and to a newspaper which for at least one year has been admitted to the United States mail, as second class matter, under the act of Congress approved March 3, 1879, and whose bid is within the legal rate; and to such contractor shall be given, during the existence of the contract, all advertising and publications ordered by the board, upon the terms and conditions of such contract. The newspaper having such advertising contract may be referred to as the official newspaper of the county."

On comparing this with the section as it appeared in the Code of 1928, it will be observed that there were two very material changes therein. The first sentence remains the same as in the code. It requires that all (1) advertising, (2) publications, and (3) printing authorized to be done by the supervisors, be let by contract annually. When, however, it comes to the notice of call for bids, required by the statute, and the limitation as to who might do the work, the law was greatly altered. The notice required by the amended statute refers only to written bids for the *advertising* and *publications* to be done, omitting all reference to *printing,* and the sentence stating who shall be entitled to the contract changes the language from "the lowest responsible bidder" to "the lowest and best bidder in the discretion of the board," and again refers only to "advertising and publications ordered by the board," omitting all reference to print-

ing. The only reasonable conclusion which can be drawn from the very carefully worded amendment is that the legislature, having discovered that while advertising and publications might be limited to newspapers only, printing could not, and desiring to allow boards of supervisors the privilege of choosing the newspaper to do county advertising and publications, regardless of which one was the lowest responsible bidder for the work, for what legitimate reason we cannot imagine, deliberately removed the requirements in regard to notice and letting of bids for *printing* as distinct from *advertising* and *publications,* from the provisions of section 778, *supra.* It may or it may not be that in so doing the legislature realized that the effect of its action would be to remove all restrictions of every nature upon the letting of annual printing contracts by the board, so far as said amended section 778, *supra,* was concerned, but that is the legal result. So far as section 778, as amended, is concerned, therefore, the only limitation on the authority of the board of supervisors to do printing which is required or authorized by statute was that it shall be done by annual contracts. If the board is to be restricted by anything in making such contracts, except the general common-law rule that its acts must be in the exercise of its best discretion for the interest of the county, such limitations must appear elsewhere in the statutes. They are not found in section 778, as amended.

▇ So far as we are advised, the only provision of our statutes which can even plausibly be contended to provide any method for advertising for or letting bids for election supplies is section 777, *supra,* and indeed it is the contention of plaintiff that this is the one that should be followed. Section 777 is the same, not only in substance but in form, as paragraph 2421, Revised Code of Arizona 1913 (Civ. Code), and paragraph 976,

Revised Statutes 1901 (Civ. Code). It is plain, there-
fore, that the legislature, by its consolidation of para-
graphs 2422, 2423, and 2424 of the Civil Code of 1913,
as section 778 of the Revised Code of 1928, and by its
amendment of section 778 by chapter 75, Session Laws
of 1933 (section 1), did not intend to enlarge nor
change the application of section 777, *supra,* to any-
thing which it did not originally cover. That section,
by its terms, is limited to certain things: (1) All books,
stationery, and supplies for county institutions; and
(2) all erections of, repairs, and alterations in any
county building exceeding the sum of $100. Election
supplies, of course, do not come under (2), but it is
contended that they are "supplies for county institu-
tions." What is the meaning of the words "county
institutions" as used in this section? If the legisla-
ture meant to require that *all* books, stationery, and
supplies used by a county were to come within the
section, the word "institutions" would have been su-
perfluous, and we must assume it was inserted for
some purpose. What then is meant by a "county in-
stitution" as distinct from the county itself? "In-
stitution" is defined by Webster's New International
Dictionary as "an established society or corporation;
an establishment, especially one of a public character;
a foundation; as, a literary or charitable institution;
the Smithsonian Institution; also, a building or the
buildings occupied or used by such organization."
Evidently the words in question refer to organizations
of some kind and not the physical property used by
such organizations. We have been unable to find any
precise definition of the words "county institution."
We think, however, that a county institution bears the
same relation to the county that a state institution
bears to the state. There are many instances of the
latter class of institutions, i. e., in Arizona the state

hospital for the insane, the pioneers' home, the state prison are all clearly state institutions, and any language in the statutes referring in general to state institutions would undoubtedly include such agencies of state action. But no one would contend that a law referring to "state institutions" applied to the state itself. We think the common definition of a state institution is one of the organizations through which the state acts as distinct from the state in its sovereign capacity, and under the same reasoning, a county institution would be one of the organizations through which a county acts, as distinct from that political subdivision of the state known as a county. Election supplies such as were involved in the present contract are not used by any county institution, but by the county itself, acting in behalf of the state in its political capacity, and we think in view of both the language and the unbroken custom of the various counties for a generation in purchasing election supplies, that it was not the intent of the legislature that section 777, *supra,* should apply to the purchase of election supplies by the county. We hold, therefore, that in purchasing election supplies the boards of supervisors of the various counties are not required to follow the provisions of section 777, *supra,* in any manner.

What, then, were they required to do when they purchased the supplies required by law for holding the primary and general elections in 1936? So far as our statutes are concerned, they were required to purchase them through annual contracts as provided by section 778, *supra,* and this was the only limitation on their power. Under the general principles of common law, they were of course required in making such contracts to use their honest discretion in seeing that such purchases were made to the best advantage of the county, and they would be liable upon

their official bonds for a fraudulent violation of this requirement. Otherwise, their discretion was unlimited as to the manner in which the necessary contracts of purchase should be made. Such being the case, we need not consider the other questions raised by the plaintiff in regard to which bid was actually in the best interests of the county. There is no intimation the board acted fraudulently or corruptly, and on plaintiff's own statement as to the manner in which the bids were finally awarded, there was room for an honest difference of opinion as to what, on the whole, was in the best interest of the county, and such being the case, the courts may not question the honest judgment of the board.

■ We do not wish to be understood as saying that boards of supervisors may not let the annual contracts for county printing, after any reasonable advertisement, to the lowest responsible bidder if they so desire. In fact, such a custom, in the absence of strong reason to the contrary, would appear to be highly commendable, but when the law does not command it, the courts may not interfere with the discretion of the supervisors, exercised within the limitations we have set forth.

The judgment of the superior court of Yavapai county is affirmed.

McALISTER, C. J., and ROSS, J., concur.