272 P.2d 358

BROWN

v.

CITY OF PHOENIX et al.

No. 5812.

Supreme Court of Arizona.

June 28, 1954.

Rehearing Denied Sept. 21, 1954.

Robert & Price, Phoenix, for appellant.

William C. Eliot, City Atty., George T. Fike, Fred F. Bockmon, and James F. Haythornewhite, Asst. City Attys., Phoenix, for appellees.

Myers & Whitlow, Phoenix, amicus curiae on behalf of Anthony Standish.

UDALL, Justice.

This appeal is from an order of the superior court dismissing application of plaintiff-appellant, L. K. Brown, dba Hertz-Driv-Ur-Self System, for a writ of mandamus and quashing the alternative writ theretofore issued, and from judgment rendered for defendants-appellees, the City of Phoenix, a municipality, and the individual members of its city council. We shall hereafter refer to the parties either by name or as plaintiff and defendants.

While the evidence is to be taken in the light most favorable to sustaining the judgment of the trial court, it appears to us that there is no conflict in the evidence as to the material facts hereinafter stated.

Plaintiff Brown is a franchisee of the Hertz-Driv-Ur-Self System (a subsidiary of General Motors Corporation), a national car rental business. He resides in Denver where his principal place of business is located, but in January, 1951, established the Phoenix business. At that time the right to rent floor space at the Phoenix Municipal Airport and operate rental cars therefrom was held by an outright month-to-month lease granted without public bidding to Anthony A. Standish, dba Avis Rent-A-Car System, for ten percent of his gross business income or $150 per month, whichever was greater.

In the latter part of June, 1952, a representative of the plaintiff called on Kenneth K. King, Director of Public Works for the City of Phoenix, and asked as to the possibility of having an opportunity to bid on the car rental lease at the municipal airport. Mr. King informed him that the Avis Company had been operating satisfactorily for some time and that the city would probably give Avis the business in the future and not open the lease to public bidding. The city attorney was consulted in the matter and he advised the city officials that the lease should be opened for public auction bidding as required by Chapter IV, Sec. 2, Par. 39 of the Charter of the City of Phoenix, which reads in part:

"(39) *Leasing of land and buildings of city.* * * * all leases shall be made at public auction to the highest responsible bidder at the highest monthly rent, * * * provided that the council may in its discretion reject any and all bids."

The city manager published an advertisement for bids and notice of public auction to be held on September 16, 1952, in the council chambers at the City Hall. It is recited therein that the auction will be held ·

"* * * for the leasing of the following described premises to the highest responsible bidder (for) a percentage of his gross monthly sales, with a guaranteed minimum of two hundred dollars ($200.00) per month rent, * * *."

At the appointed time two bidders appeared. After some preliminary sparring, Mr. Standish, of the Avis Company, entered his bid of 17% of the gross monthly rentals and plaintiff entered a final bid of 18% of the gross monthly rentals at the airport and presented proof of proper insurance responsibility. The city council referred the bids to the city manager and recessed until that afternoon. Upon reconvening it was the recommendation of the Municipal Aeronautics Commission, the Public Works Director, and the Superintendent of Airports

"* * * that the award be made to Anthony Standish as being the highest and best bid when all factors are considered of service and experience of airport operations."

After some very enlightening comments by members of the council, which will be examined more fully hereafter, by a vote of four to one (Councilman Goldwater and Walters were absent) the council concurred in the recommendation and awarded the lease to Mr. Standish. Mayor Foster placed in the record certain letters not formally identified, written by persons favoring the granting of the lease to Standish for the reason that he was experienced in the car rental business. Plaintiff Brown promptly filed complaint and application for writ of mandamus in the superior court, in which it was alleged in part as follows:

"* * * and that due to the arbitrary, capricious and unfair manner in which said lease was awarded on a lower and inferior bid, was beyond the proper and legal discretion of said City Council; and that this suit is to compel the admission of the plaintiff to the use and enjoyment of a right to which he is entitled."

An alternative writ of mandamus was issued. An answer to application for writ was filed and the matter was tried on its merits to the court. At the conclusion the court found, among other things, that the city council in awarding the lease to Standish "did not act in an illegal, unfair or arbitrary manner, nor did it act in bad faith." It thereupon denied the peremptory writ of mandamus and quashed the alternative writ theretofore issued. This appeal followed.

■ From the outset the defendants have challenged the right of the court to control by mandamus the discretion of the city council in awarding the lease in question, as fraud was not alleged. While there is respectable authority for such a position (See Anno.—Mandamus—Public Contracts, 80 A.L.R., II, b, p. 1388): this is held to be too narrow a view of the powers of the court:

" * * * the better view appears to be that, the other essential elements of relief being present, it is sufficient to support the issuance of a writ that the action taken upon bids has been plainly arbitrary." p 1388, ibid.

To the same effect (as an exception to the general rule) is this quotation from Mc-Quillin, Municipal Corporations, 3rd Edition, Vol. 17, Sec. 51.18—Abuse of Discretion:

"The discretion of an officer, board or tribunal which will not be controlled by mandamus is, in the eye of the law, a sound legal discretion, not a capricious, arbitrary or oppressive one. The courts generally hold that if an administrative officer abuses his disretion and exercises it in an arbitrary or capricious manner, persons injured thereby may obtain relief by mandamus. * * *"

While this court has not had occasion to pass upon this question directly in situations involving public bidding, we believe the following quotation from Peters v. Frye, 71 Ariz. 30, 223 P.2d 176, 179, bears it out in principle:

"Finally we consider the plaintiffs' right to a writ of mandate to control the action of the board. The mandamus statute, section 28–201, A.C.A. 1939, provides in effect that such mandate will issue only to compel the 'performance of an act which the law specially imposes as a duty resulting from an office, trust or station'. Ordinarily this coercive remedy is invoked to compel the doing of a purely ministerial act; e. g., see Martin v. Whiting, 65 Ariz. 391, 181 P.2d 819; State v. Board of Supervisors, 14 Ariz. 222, 127 P. 727; Earhart v. Frohmiller, 65 Ariz. 221, 178 P.2d 436, however within certain well-defined limitations the writ will also issue where there has been an abuse of discretion. We quote from Collins v. Krucker, 56 Ariz. 6, 104 P.2d 176, 179: 'The general rule is that if the action of a public officer is discretionary that discretion may not be controlled by mandamus. *This rule, however, is qualified by the provision that if it clearly appears that the officer has acted arbitrarily and unjustly and in the abuse of discretion, the action may still be brought.*' cf. Prescott Courier v. Board of Supervisors, 49 Ariz. 423, 67 P.2d 483." (Emphasis supplied.)

We therefore hold that the trial court correctly denied the preliminary motion to quash the alternative writ and properly reserved decision until the proof was all in.

The problem under consideration is the extent and nature of the powers vested in the council of the City of Phoenix in leasing land and buildings belonging to the city, where the charter provides that such leases shall be made at public auction, to

the highest responsible bidder, and then grants to the council the discretion "to reject any and all bids". It seems to be the position of the defendants that the magic words in quotes, supra, justify the action taken by defendants, and contain the complete answer to this appeal. We disagree. The undoubted purpose of the law is to benefit the taxpayers and citizens of the city by regulating the manner in which disposition may be made of city property, to the end that the city shall secure as great a return for its property as is reasonably possible. The purpose of requiring competitive bidding is "to prevent the plundering of the taxpayers" and as between two bidders equally responsible the municipality cannot reject the lower bid. Osborn v. Mitten, 39 Ariz. 372, 6 P.2d 902. Incidentally both sides strongly rely upon this leading case. The cases agree that the power to grant the contract to the highest (or, in the ordinary situation, the lowest) *responsible* bidder, implies an exercise of discretion in determining responsibility, for that word embraces such elements as the bidder's integrity, skill, capacity, experience, and facilities for doing the word he is contracting to perform. Osborn v. Mitten, supra; McQuillin, Municipal Corporations, Vol. 10, Secs. 29.72, 29.73. Likewise, the power to reject any or all bids is a further grant of discretionary power. Of this power, McQuillin, Municipal Corporations, Vol. 10, Sec. 29.77 says:

"In exercising the power to reject any or all bids, and proceeding anew with the awarding of the contract, the officers cannot act arbitrarily or capriciously, but must observe good faith and accord to all bidders just consideration, thus avoiding favoritism, abuse of discretion, or corruption. Although the courts generally will not disturb an honest exercise of discretion, it has been said that they will intervene to prevent the arbitrary rejection of a bid when its effect is to defeat the object to be attained by competition."

In the well-reasoned opinion in State ex rel. Journal Printing Co. v. Dreyer, 183 Mo.App. 463, 167 S.W. 1123 (overruled on another point, State ex rel. Johnson v. Sevier, 339 Mo. 483, 98 S.W.2d 677), the court declared [183 Mo.App. 463, 167 S.W. 1130]:

"* * * And the general rule is to be deduced from the authorities above referred to is to the effect that, though the right to reject bids be reserved, nevertheless the officers intrusted with the public duty in question are not free to act arbitrarily through caprice, favoritism, by collusion, and in bad faith, thereby abusing the discretion reposed in them, or failing to exercise the same."

With these apt words in mind, let us examine in greater detail the action taken in the case at bar by the city council in re-

374

jecting the high bid of 18% of the gross revenue and accepting the lower bid of 17%. Before bids were called for the car rental space at the airport, Public Works Director King gave unmistakable evidence of bias and favoritism toward the Avis Rent-A-Car System, which carried over into the council meeting called for the purpose of receiving the bids. When the council reconvened in the afternoon of September 16, 1952, the minutes show the following proceedings were had:

"* * * Mrs. Kober remarked that she did not see how the award could be made on other than the highest bid.

"Councilman Williams remarked that Mr. Standish had gone into every airport in the State with his cars, and the Public Works Director pointed out that his bid is a higher amount than is being paid at the present time.

"Councilman Murphy: 'This man has been there at that airport when it was a losing proposition operating that thing; and now that we have a terminal building that is a credit to the City these people want to come in, and I certainly concur in the recommendation.'

"Public Works Director King: 'May I say there is a great deal involved other than the greatest revenue to the City, from a service standpoint. I have been informed his lowest rates are $5 a day or 7 cents a mile, and the other agency's is $6.75 and 8 cents a mile, which is some benefit to the public. I just thought I would mention that. And, as I said before, I think you won't find anywhere that anyone is paying more than 15 percent. I think it is to the best interests of the City to accept this.'

"Mrs. Kober wondered what would have happened had there been several different bidders with several percentages.

"Councilman Williams stated that it was his feeling that from a service standpoint, considering the fact that Avis has established the system all over the State and has pioneered in the business as far as Sky Harbor Airport is concerned, that they are entitled to continue.

"Mayor Foster remarked that since several groups had taken the trouble of writing him concerning their satisfaction with Avis service, he would file with the Clerk several letters to that effect in order that the record might show that the Tucson Airport Authority, the Bisbee-Douglas International Airport, Frontier Airlines, and Trans World Airlines, Inc., had written letters of recommendation.

"Councilman Williams suggested that if Mrs. Kober felt strongly about the matter, there might be further consideration.

"Mrs. Kober replied that 'it isn't one man against another. It seems to me we should take the highest bid. We have to assume they are going to perform—I mean any of them.'

"After some further discussion, Councilman Murphy said, 'I have checked into this man's record, and I am going purely on his record, and I have never found anyone but what praises him and the service he rendered during very lean times when there wasn't very much business at the airport.'

" 'I move we concur in the recommendation.'

"Motion seconded by Councilman Sullivan.

"Motion carried, Mrs. Kober voting in the negative."

Curiously enough, within ten days after the lease was granted to him, partially for the reason that he charged lower rates to the public, Mr. Standish raised his rates to equal or exceed slightly those charged by plaintiff, and it appears from the record that Mr. King lent his approval to such action. At any rate, it is admitted there was absolutely no investigation of the responsibility of plaintiff and no inquiry made as to his facilities and capacity to perform his part of the lease agreement, and it is further conceded that plaintiff could perform the contract and that his

personal integrity and business ability are the finest.

No calculation was necessary to determine whose bid was superior as prima facie the bid of 18% was the better bid and was to be accepted before the bid of 17%. We agree with the Supreme Court of New Jersey, speaking in Sellitto v. Cedar Grove Tp., 133 N.J.L. 41, 42 A.2d 383, 385, that:

"The law is clear. Prosecutor's status, as the lowest bidder, is not one of grace; it is one of right. Such a status may not lightly be disturbed. For it is based upon competition, a state policy. * * * That policy, concededly applicable here, aims to encourage public bidding, pursuant to advertisement therefor, and to protect the lowest responsible bidder. That policy further aims to avoid favoritism and to safeguard the taxpayers. * * *"

It was within the discretionary power of the council to award the lease to the less favorable bidder, providing that after due investigation into the facts they fulfilled the trust imposed on them in the disposition of the public's property, exercised a reasonable, honest, and prudent discretion, and concluded it was in the best interests of the city, its citizens and taxpayers, so to do. Can it be said that this high trust was here fulfilled? We think not. If a lease may be granted to the lower bidder because the members of the council have a sense of loyalty to him for past services rendered

376

(without public bidding, we note), or because he renders fine services to the public in other cities, or because he has pioneered in the business, or is recommended by sundry personages, while at the same time the higher bidder could render equal services and perform as well, and is equally responsible, then by a reductio ad absurdum the lease might be granted to one who bid one percent of his gross income because he had six children to support, was hale-fellow-well-met, or voted the straight "vegetarian ticket". Such nonsense serves only to illustrate that the word "discretion" does not mean "caprice", and that discretion cannot operate in a void, but only upon facts which are material to the matter under consideration. In State ex rel. Journal Printing Co. v. Dreyer, supra, 183 Mo. App. 463, 167 S.W. 1123, 1130, we find these appropriate words:

"* * * It would indeed be a mockery to say that men charged with the performance of a public duty, such as were appellant members of the city council, could refuse to discharge their plain duty in the premises, and take refuge behind an official discretion reposed in them, but which, in fact, they failed and refused to exercise."

Nor does the fact that there is no evidence of fraud or corruption on the part of the city council, and that what they did was done openly and above board, cure the evil complained of, i. e., favoritism, cf. Southern Surety Co. v. City of Prescott, 26 Ariz. 66, 221 P. 834.

After plaintiff had put on all his evidence at the trial, it was suggested by counsel for defendants that perhaps after all the bid of 18% was not the high bid because the lower bidder might do a greater volume of business and thus be in reality the higher bidder. Ignoring the fact that this suggestion came as a complete surprise to all concerned in that it was not one of the variables enumerated in the notice calling for bids and was in effect adding a new requirement, the fact remains there is no proof to support the suggestion that Standish as a representative of the Avis Rent-A-Car System would do a greater gross business at the airport in Phoenix than the plaintiff. While it is true that the evidence shows this latter company operates a rental service at all of the commercial airports in the State of Arizona (approximately 12 in number, as against the three cities (Phoenix, Tucson, and Wickenburg served by the plaintiff, yet on the national scale from which the great volume of business stems we find that the Hertz Company maintains 575 offices and serves 60 to 80 airports as compared with 185 offices maintained by the Avis Company. Furthermore the Hertz Company carries on a national advertising program and gives to its reliable customers national credit cards. There is no evidence in the rec-

ord as to whether such practices are followed by the Avis Company.

A most careful analysis of the evidence, taken in the light most favorable to the defendants together with inferences properly deducible therefrom, convinces us that the record does not sustain the trial court's finding that the city council "did not act in an illegal, unfair or arbitrary manner, nor did it act in bad faith" in awarding the lease in question to one whose bid was unquestionably inferior in so far as dollars and cents are concerned. Where, as here, a finding is "clearly erroneous", it is our right and duty to set it aside. Rule 52(a), Rules Civil Procedure, Sec. 21–1028, A.C.A.1939. See Gillespie Land & Irrigation Co. v. Jones, 63 Ariz. 535, 164 P.2d 456; Todaro v. Gardner, 72 Ariz. 87, 231 P.2d 435. Nor were there any other factors or bases that justify the action taken, rather, the action of the city council conclusively indicates a fixed intention to award the lease in question to Mr. Standish. It cannot be claimed that this award was made in the best interest of the city. The letting of contracts for public business should be above suspicion of favoritism.

The judgment of the lower court is reversed with directions that a peremptory writ of mandamus shall issue as prayed for.

PHELPS, C. J., and STANFORD, LA PRADE and WINDES, JJ., concur.