299 P.2d 1071

HERTZ DRIVE–UR–SELF SYSTEM, Inc., of Colorado, a corporation, Appellant,

v.

TUCSON AIRPORT AUTHORITY, a civic or municipal corporation; R. W. F. Schmidt, as manager of; and L. P. Hermes; Fred R. Stofft; J. B. O'Dowd; Louis J. Feliz; B. J. Kemp; Leon Levy; Lew Place; William Small; Patrick M. Tidmarsh; as directors of the said Tucson Airport Authority, Defendant-Appellees.

AAA Auto Rental of Tucson, Inc., an Arizona corporation, Intervener-Appellee.

No. 6079.

Supreme Court of Arizona.

July 16, 1956.

Udall & Udall, Tucson, Robert & Price, Phoenix, for appellant.

Boyle, Bilby, Thompson & Shoenhair, Tucson, for defendant-appellees.

Jack C. Cavness, Phoenix, for intervener-appellee.

PER CURIAM.

This action in mandamus was commenced against the Tucson Airport Authority and others to compel the cancellation of an automobile rental franchise awarded to intervener-appellee and further to compel the awarding of such franchise to appellant. The defendant Tucson Airport Authority is a non-profit corporation organized under the laws of Arizona. By virtue of the power conferred by Chapter 48, A.C.A., 1939, as enacted and amended [now A.R.S. § 2–101 et seq.], and agreeably with the apparent legislative purpose, the City of Tucson leased to said corporation for a long term and upon a nominal rental its airport by which the premises and all of its appurtenances are put in the complete charge of the said non-profit corporation. The provisions of the lease, with the exception of one subject which will be stated, are of no immediate interest in connection with this litigation. Under this business arrangement the Airport Authority has operated and had the full control of the Tucson airport, managing it in no way different from the manner in which any like property would be managed by an owner, the great distinction however being that all revenues, income and gains are held, received and paid for the benefit of the city. The non-profit corporation in every way acts as the arm of the city in the operation of the Airport. One of the individual defendants is the executive manager of the corporation. The others constitute its Board of Directors.

The lease of the airport property executed by the City of Tucson to the corporation contains this clause, viz.:

"7. *Expenditures in Excess of Twenty-five Hundred Dollars.*

"In the erection, improvement and repair of all buildings, structures, works, runways, improvements, fixtures and personal property, and in furnishing supplies and materials for same or for any other use by the Authority, when the expenditure required exceeds the sum of twenty-five hundred dollars ($2500.00), the Authority shall advertise for bids for the work contemplated and for furnishing such supplies and materials, and ask for sealed proposals.

Any such contract shall be let to the lowest responsible bidder. The Authority may, however, reject any and all bids submitted and may re-advertise for bids."

A part, and no doubt an essential part, of the service rendered to the patrons making use of the airport facilities is to furnish cars for rent in which they may drive away from the Airport and return to it for departure when their missions are ended. Experience has demonstrated that a monopoly service is required that there may be order and decorum when many passengers arrive to be served and that such cars may be present and ready to serve even in the contingency that no customer be present at the landing of any given flight. For some period of time prior to the spring months of 1953 this monopoly privilege had been held by the intervener corporation as a licensee of the Airport Authority. The date of expiration of the license so granted as fixed by its terms was November 30, 1953.

By word of mouth only, and informally, by such procedures as to mention the subject to reporters of the press and to others, the manager of the Authority let it be known in the spring of 1953 that the Authority would receive bids for this monopoly license. In no other way was the subject broached to the public. There were no specifications; there was no advertisement; no more than an expression that the Authority was interested to receive offers and that it would consider them on June 30.

A sealed offer was submitted by the plaintiff. A sealed offer was at some unspecified date submitted, and later withdrawn by the intervener, which afterwards substituted for it another sealed offer. These two offers, being the only ones received, were opened on June 30. Plaintiff's offer has been preserved. Intervener's offer has in some way been lost, and a copy also lost. Its precise terms have not been established; but in negotiations carried on between the officers of the Authority and those of the intervener a new contract was made whereby the franchise was given to intervener for a period of three years upon conditions of which the most salient are these:

That it would pay for the franchise the monthly sum of $375, or 10% of its gross monthly car rentals, whichever should be more; that it would provide a minimum fleet of 30 cars, and as many more as required, to meet the demand at the Airport; that the Authority should have the option to terminate the contract upon 60 days' notice if in its sole judgment such should be necessary in the operation and management of the airport.

The plaintiff's offer was to pay for the exclusive franchise the monthly sum of $450, or 12½% of its gross revenue from the airport service, whichever should be

greater; adding, however, this clause: "In computing gross revenue, damage and conversion cost, if any, is to be excluded." The offer was further to keep available at the airport at all times a minimum of 15 cars, and at least 25 cars during December, January, and February.

This contract between the Authority and the intervener was executed on July 24, 1953. It was to go into effect on December 1, 1953. This action in mandamus to require the Authority to award the contract to plaintiff was begun within a few days after the judgment in Brown v. City of Phoenix, 77 Ariz. 368, 272 P.2d 358, became final about October 1, 1954. A full trial to the court was had and at its conclusion and after briefs this order was entered: "The Court being unable to find any legal obligation on the part of the defendants to call for bids, or to award the contract involved herein to the highest and best bidder, It is Ordered that * * * the complaint be dismissed * * * and the Writ of Mandamus quashed."

Appellant strongly relies upon the holding in Brown v. City of Phoenix, supra. In view of the substantial identity of the plaintiff in that case and in this and of the general likeness of one cause to the other it may be that in its view the significance of that opinion has become magnified. There exist, however, great distinctions as a review of the facts disclosed and a comparison of one case with the other at once reveal. The one point of difference in the two Brown case bids and in the respective rights of the two bidders upon which it became the duty of the City Council to make a choice was that one offer was to pay 17% and the other 18% of gross receipts from the franchise, all other factors with relation to the two bids remaining constant, the two bidders being, except for the percentage of their offered payment, upon an absolute par with each other. The opinion, in a most excellent expounding of many of the principles applying in mandamus actions, establishes as a legal verity the mathematical truth that 18% of a given sum of money will produce a greater amount than 17% of the same sum, and that there is no room for differences of opinion upon the point.

It is argued that the Tucson Airport Authority is such a private corporation as to be with its officers immune to mandamus. It is true that in its outward forms the corporate defendant is not distinguishable from other private corporations, but when it is considered that the sole reason for its existence is to advance the public interest in the operation, maintenance and improvement of the city-owned airport and landing field; that its revenues are all public money and devoted to the use of its landlord the city; and considering also the terms of the cited statute from which in so large a part its powers are derived it would seem strange if the courts would not cut through its outward forms and see it in its true na-

84

ture as a public arm of the state and its officers performing public rather than private functions.

■ The plaintiff (Hertz) and the intervener (Avis) as rivals for the car-rental franchise were not in fact bidders in the sense that they were responding to a call for bids, for there had been no such call— no formal advertisement, no specifications for the bidders to follow, no standard of comparison to be applied to all bids. As there were no bids, there could be no legal duty upon the Authority's part to accept any bid. Because the Authority is an instrumentality of the State it does not necessarily follow that before it may make an award of a contract it must call for bids. The language of its lease with the city relative to the occasions for such calls has been set forth. There is no other provision in the lease upon this subject, nor otherwise, requiring bids. The quoted article 7 has to do with expenditures, not with receipts or items of income.

■ The language of the Charter of the City of Tucson is relied on by appellant as requiring the city to award the bid to the highest and best bidder. The Charter provides that the city shall have power:

"To lease to persons, firms or corporations for the purpose of maintenance, operation or use, any public utility owned or controlled by the city, and to provide for the leasing of any lands now or hereafter owned by the city, except lands donated, purchased, or used as public parks or playgrounds; provided, that any such leases shall be made only to the highest bidder therefor by ordinance duly adopted, and provided, further that any and all bids for any such lease may be rejected at the discretion of the legislative body of the city; * * *."

We point out that if it be assumed that the Tucson Airport Authority as an agency of the city is governed by and required to conform to the provisions of the City Charter, still in application it is limited to the leasing of municipal property. The instant case does not involve a lease but is a contract for services and accordingly the charter provision is not applicable.

■■ It is the rule that " * * * In the absence of some controlling constitutional or statutory provision, municipal ordinance, or other legislative requirement, competitive bidding is not an essential prerequisite to the validity of contracts for public work, contracts to furnish materials to public bodies, or other contracts by and with public bodies." 43 Am.Jur. 765, and see Cimarron Utilities Co. v. Guymon, 171 Okl. 344, 43 P.2d 143; Reiter v. Chapman, 177 Wash. 392, 31 P.2d 1005, 92 A.L.R. 828; Malette v. Spokane, 77 Wash. 205, 137 P. 496, 51 L.R.A.,N.S., 686, Ann.Cas.1915D, 225; 10 McQuillan, Municipal Corporations, 3d Ed., Sec. 29.31. It is reasonable

that a statute requiring bids "is restrictive and should not be extended beyond the language used in it." Otter Tail Power Co. v. Village of Elbow Lake, 234 Minn. 419, 49 N.W.2d 197, 203, 27 A.L.R.2d 906.

■ That bids were not required, and that they were not officially called for, and that such a contract might be based upon negotiations does not necessarily mean that a Board acting as an arm of the state could at its uncontrolled pleasure arbitrarily fix upon terms with one contractor to the utter exclusion of the offers of another contractor, and upon terms disadvantageous to the public. The Board has no such absolute rights in executing its public powers. Its right is measured by its duty, which is to act in the public interest, to be fair, honest, prudent and to exercise a wise discretion in the awarding of its contracts. It is conceded that the appellant and the intervener are equally qualified as contractors to render the services to be performed under the proposed franchise.

When the two bids are compared would all reasonable minds with one voice say that the appellant's offer was the better of the two offers? Would it be agreed that the public interest fairly required the rejection of the intervener's offer and the acceptance of the appellant's offer? Or is there room for an honest and just answer to be made that the intervener's offer is more advantageous to the public than that of the appellant?

If, as in Brown v. City of Phoenix, the percentages and the minimum payments represented the only criteria submitted to the judgment of the Authority, there would be but one answer; $450 per month is $900 in the year more than $375 per month; and obviously a payment of 12½% of gross will yield more than 10% of the same figure.

■ But these were not the only terms of the two offers set in apposition before the Authority's Board, nor were the calculations to be considered alone without relationship to other factors. Of the offer by appellant at least the contingent 12½% payment was subject to: "In computing gross revenue, damage and conversion cost, if any, is to be excluded." No such, nor any, reservation was made in the opposing bid. In the proofs it appears that a desideratum of the Authority, for budgeting purposes, was certainty in this item of income, and that it had no way of estimating the amount of this exclusion. It might depend upon chance, and the loss by conversion or damage of even one car in a year out of probable thousands of transactions could render the other offer more remunerative. Another difference in the two offers had to do with the number of cars pledged to the operation, a minimum of 15 to be so devoted by the appellant, and 30 by the intervener. Of a greater interest to the public, both of the City of Tucson and of the traveling pub-

86

lic, than money alone were service to the public and the satisfaction of the public with the services made available by the Airport. It is not unreasonable to assume that if 30 cars were not needed for the service they would not have been required to be furnished by the contractor; and it is reasonable also to assume that the earnings of 30 cars could be substantially more than the earnings of 15, or that 10% of 30 might outstrip 12½% of 15, the experience of the Airport indicating that the percentage under either offer would determine the amount of the payments rather than the guaranteed minima. In view of these considerations it cannot with justice be said that the discretion of the Authority Board was abused or improperly influenced.

We conclude that since the writ of mandamus is issued only to compel performance of an act which the law especially enjoins as a duty, concerning which a public officer has no discretion, Adams v. Bolin, 77 Ariz. 316, 271 P.2d 472, Board of Regents of University and State Colleges v. Frohmiller, 69 Ariz. 50, 208 P.2d 833, and since a public officer's discretion may not be controlled by the writ of mandamus if the public officer has not acted arbitrarily and in abuse of discretion, Brown v. City of Phoenix, supra, Peters v. Frye, 71 Ariz. 30, 223 P.2d 176, Collins v. Krucker, 56 Ariz. 6, 104 P.2d 176, the trial court did not err in directing that plaintiff's complaint be dismissed and the writ of mandamus quashed.

Judgment affirmed.

Note: Justice UDALL, having disqualified himself, the Hon. HENRY C. KELLY, Judge of the Superior Court of Yuma County, participated in his stead in the determination of this appeal.