495 F.Supp. 373 (1979)
INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS and Eugene Tapp, Individually and on behalf of all International Society for Krishna Consciousness members, Plaintiffs,
v.
David ENZ, Chief, Tucson Airport Authority Police; Stephen Neely, County Attorney for Pima County, Individually and in their official capacities, Defendants.
Civ. 78-056-TUC-WCF (TFM).
United States District Court, D. Arizona.
November 19, 1979.
Robert C. Moest, Barry A. Fisher Law Offices, Los Angeles, Cal., Mark B. Raven, *374 Risner, Raven & Collins, Tucson, Ariz., for plaintiffs.
John A. Robertson, Bilby, Shoenhair, Warnock & Dolph, P. C., Tucson, Ariz., for defendant David Enz.
John C. Gabroy and Ronald M. Lehman, Deputy County Attys., Civ. Div., Tucson, Ariz., for defendant Stephen Neely.

MEMORANDUM
THOMAS F. MURPHY, Senior District Judge.
The complaint, by way of "INTRODUCTION," summarizes plaintiffs' claim in these words:
"This is a civil rights suit for `declaratory and injunctive relief' pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-02 brought by the INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS and EUGENE TAPP, an individual devotee, to enjoin Defendants from enforcing the Rules and Regulations concerning picketing, where Plaintiffs' conduct is limited to peaceably walking about the public portions of the Terminal Building of the Tucson International Airport, talking to members of the public about their religion, distributing religious tracts, and soliciting contributions to support their Church. Plaintiffs seek temporary injunctive relief so that they may proceed with their prosetelyzing, which is the very mainstay and life blood of their religious movement."
"JURISDICTION"
"Jurisdiction * * * is invoked under 28 U.S.C. § 1331 (federal question) and § 1343(3-4) (civil rights). The matter in controversy exceeds $10,000 exclusive of interest and costs."
Defendants are the Chief of the Tucson Airport Authority Police, David Enz, and the County Attorney for Pima County, Arizona, Stephen Neely.
A hearing on plaintiffs' motion for a temporary injunction was held on November 4, 1978. The hearing was before the Honorable William C. Frey, who died before filing a decision. The attorneys for the parties subsequently stipulated that: "This matter may be submitted for consideration on the record and for decision by a new United States District Judge to whom this matter may be assigned by the Honorable Mary Anne Richey. Dated: April 2, 1979." The "matter" was referred to us on April 4, 1979 by Judge Richey while we were sitting by designation in the District Court of Arizona.
Although each defendant, in his answer, denied plaintiffs' allegations concerning their religion, "Krishna Consciousness," including the allegations of its history, precepts and practices, neither defendant offered any evidence at the hearing to contradict these allegations or plaintiff Tapp's "Declaration" setting forth the same in great detail.
Tapp had signed a 13-page "Declaration" which was filed with the complaint in support of an ex parte motion (later withdrawn) for a temporary restraining order. At the hearing for a temporary injunction plaintiffs' counsel told the Court that under a new law[1] the "Declaration" "is sufficient evidence at least [for] my direct case." After a short discussion, the parties agreed that if Tapp swore to or affirmed the truth of the allegations in the "Declaration," it would be considered as his direct testimony. Tapp then affirmed its truth, and was cross-examined by both defendants' attorneys and by his own on redirect.
We therefore will summarize and quote from the allegations in the "Declaration," plaintiffs' case in chief, and compare them with the proof. Tapp's "Declaration" states that the International Society of Krishna Consciousness is an International religious society which espouses the "religious and missionary views of Hinduism as expressed by the Hindu denomination Krishna Consciousness." Its scriptural foundations are *375 the Vedas, ancient Hindu religious texts. "Veda means knowledge descending from the Supreme Lord or Godhead to man, * * *." Tapp's "Declaration" continues with the following:
"* * * the recommended means for achieving the mature state of love of God in this age of Kali, or quarrel, is to chant the holy names of the Lord. The easiest method is to chant Hare Krsna Mantra: Hare Krsna, Hare Krsna, Krsna, Krsna, Hare, Hare, Hare Rama, Hare Rama, Rama Rama, Hare Hare.
* * * Lord Caitanya taught that public broadcasting and publishing of the glories of God is the only effective means of revival of Krishna Consciousness in the present age. This process of glorification is called `sankirtan yajna' in Sanskrit, * * *.
* * * * * *
* * * The Sankirtan movement was brought to the Western World ten years ago by his Divine Grace A. C. Bhaktivedanta Swami Prabhupada, * * *."
The devotees have been instructed to
"go wherever people publicly gather, collect alms, and distribute literature describing the glories of God. Therefore, the profuse distribution of books has become our life and soul.
* * * * * *
In contrast to the complexity and anxiety of modern life, the Krishna Consciousness life is based strictly upon the Vedic principle of `simple living and high thinking.' Meat eating, nonmarital, nonprocreational sex, intoxication and drugs, and gambling are absolutely prohibited.
* * * * * *
ISKCON's purpose is two-fold. First, it provides a living situation in which devotees can peacefully execute their spiritual life, secondly, it seeks to make this knowledge available to as wide a number and cross-section of the population as possible. It is a devotee's duty and sincere desire to benedict [sic] everyone, regardless of race, creed, color or nationality, with this sublime wisdom of Vedic knowledge that leads back to Godhead.
* * * * * *
Our practice is to attempt to talk to members of the public about our faith, to advocate the reading of our literature, and to encourage donations to support our religion. The distribution of prasadam in the form of a piece of candy is sometimes involved in Sankirtan."
Since defendants offered no proof to contradict any of these statements, we will assume as an uncontested fact that Tapp is a devotee of a religion, Krishna Consciousness, which requires him to prosetelyze the public and attempt to convert them to his religion, to distribute religious tracts, and solicit funds for the spread of Krishna Consciousness.
Paragraph 10 of the complaint states:
"10. Plaintiffs have been informed by defendants and by Airport Authority General Manager Charles Broman that the Rules and Regulations concerning picketing and demonstrations at Tucson International Airport * * * prohibit first amendment related activities except in certain remote areas outside the terminal building, and that devotees of International Society for Krishna Consciousness would not be permitted to distribute religious tracts, prosetelyze, or to solicit contributions, except in the areas set aside in the rules for such activities. Plaintiffs have been further advised that any devotee of Krishna Consciousness who engages in such activities within the terminal building, or in any other area not designated in the regulations, would be asked to leave the airport grounds. If the individual persisted in the activities, he or she would be arrested and prosecuted." (Emphasis ours)
And paragraph 3 of Tapp's "Declaration":
"3. During the week of January 30, 1978 I called the Tucson Airport Authority and spoke with Airport General Manager Charles BROMAN. He informed me that the Rules and Regulations Concerning *376 Picketing and Demonstrations at Tucson International Airport * * * prohibited First Amendment related activities except in certain areas outside the terminal building, and that devotees of the International Society for Krishna Consciousness would not be permitted to distribute religious tracts, to prosetelyze, or to solicit contributions, except in the areas set aside for such activities. Mr. Broman further advised me that any devotee of Krishna Consciousness who engaged in such activities within the terminal building, or in any other area not designated in the regulations, would be asked to leave the airport grounds. If the individual persisted in the activities, he or she would be arrested and prosecuted." (Emphasis ours)
The allegations of the complaint and paragraph 3 of Tapp's "Declaration" charging a First Amendment free exercise of religion violation are based on one telephone conversation between Tapp and Broman, the General Manager of the Tucson Airport. Although there is some contradiction of Tapp's testimony concerning his phone call in January, 1978 by Broman,[2] we will adopt as facts Tapp's oral testimony of the call and summarize it as follows:
Some time in January, 1978 Tapp telephoned Broman requesting permission to distribute literature and collect donations within the Tucson International Airport terminal building for his movement. Broman advised Tapp that they wouldn't be allowed to do this activity in the building.
We have based our finding on the transcript of the Court's questioning of Tapp at the hearing on November 4, 1978, which reads (Tr. p. 43-45):
"THE COURT: Getting to your affidavit or statement in support of this request for an injunction, I believe you just telephoned the Airport for permission to solicit; is that correct?
A. Yes.
* * * * * *
Q. You never made any effort to gain admittance to the Airport Terminal Building?
A. No.
Q. You never undertook to solicit in any manner on the Airport property?
A. No.
Q. Where were you when you telephoned the Tucson Airport?
A. San Diego.
* * * * * *
Q. And what did you say; do you remember?
A. I asked Mr. Broman if it was allowed for our movement to distribute literature and collect donations.
Q. Where?
A. In the Airport terminal.
* * * * * *
Q. And what response did you get?
A. He said there were designated areas outside of the terminal, but that we wouldn't be allowed to do this activity inside the terminal.
Q. At the time you made that request you had been at the Tucson Airport terminal?
A. Yes.
Q. Physically you had been there?
A. Yes.
Q. So when you were told what areas for solicitation or preaching you would be allowed in, you knew what was being referred to?
A. Yes, I had a diagram.
Q. You had that diagram at the time you called?
A. Yes.
Q. And at the time you called, were you in fact seeking to solicit at the Tucson Airport, or were you merely seeking information as to whether you would be permitted to solicit at the airport?
A. Well, I was seeking permission as to whether we would be allowed to.

*377 Q. At that time you were the manager of the San Diego Temple?
A. Not the manager, no, not at that time.
Q. You were a manager?
A. Yes, at that time I was stillI was still distributing books.
THE COURT: Thank you. I have nothing further."
Broman's testimony was as follows (Tr. p. 10-11):
"Q. Has the Hari Krishna group ever inquired about solicitation at the airport?
A. Yes.
Q. When did they do so?
A. It was about this time [Nov. 4] last year; I think it was November of last year.
* * * * * *
Q. And what happened?
A. Well, I received a telephone call, not from the gentleman that preceded me here, but another gentleman from the west coast. I advised him of our rules and regulations and I submitted him a copy of our rules and regulations.
Q. And were the Hari Krishna ever offered an opportunity to solicit?
A. Yes.
Q. Have they ever attempted to do so?
A. No."
As can be learned from the transcript of the testimony, this is all that was said by Tapp and by Broman concerning the telephone call. Tapp never testified, on being questioned by the Court, that he was informed that if he did not stop soliciting when requested to do so he would be asked to leave and if he refused, he would be arrested and prosecuted, as he states in his "Declaration." Nor is there any clue to such a threat in Broman's testimony. Neither the attorneys for plaintiffs nor for defendant Enz made any effort to examine Tapp or Broman any further as to this important telephone conversation. However, counsel for Neely, the County Attorney, did, and we quote his short examination going directly to the heart of the matter as far as his client was concerned (Tr. p. 32-33):
"Q. Thank you, your Honor. Mr. Tapp, my name is Ron Lehman and I represent the defendant Stephen Neely, in this action. Now, first of all, do you know who Mr. Neely is?
A. No.
Q. Okay. Stephen Neely is the elected Pima County Attorney in this county.
In your affidavit at page two, paragraph three, you state that if the individual persisted in the activity, he or she would be arrested and prosecuted. The first thing I'd like to ask you, has Mr. Neely or any of his subordinates ever threatened you with prosecution for violating the airport rules and regulations?
A. The only person I remember speaking to is the manager.
Q. So I take it your answer is no, Mr. Neely has never threatened you with prosecution for violation of the rules and regulations of the airport?
A. Not personally.
Q. Has Stephen Neely, or any of his subordinates, ever threatened you with a violation of any other Arizona laws?
A. No.
Q. Has he threatened anyone else, to your knowledge, any other devotees?
A. No."
Accordingly, there was not one tittle of proof at the hearing concerning any act or statement attributed to either defendant[3] to the effect that Tapp or any member of Krishna Consciousness who solicited funds within the terminal and refused to stop when requested to do so would be asked to leave, and if he or they refused, he or they would be arrested and prosecuted.
This factual basis which we have summarized, and a copy of the Rules and Regulations of the Airport, are the sum total of plaintiffs' proof of the claimed violation of Tapp's First Amendment right of free exercise of religion compared to the allegations of the complaint and Tapp's "Declaration."
*378 The Rules and Regulations of the Airport, an exhibit in evidence, relate exclusively to picketing and demonstrations and restrict the parties engaged in those activities to certain areas outside the terminal building but in close proximity thereto. There is no word or expression relating to solicitation, prosetelyzing, or benedicting [sic]. No criminal penalties are mentioned or even referred to. The only tangential relevant provision in these Rules is paragraph D. 7, which reads: "Any person or persons who picket or demonstrate at Tucson International Airport in a manner or at a location which is inconsistent with these rules and regulations shall be ejected from the airport premises." This is hardly a substitute for a threatened arrest and prosecution.
Not only was there no proof of any threat of arrest or prosecution by any law enforcement authority, but Tapp himself was uncertain whether he was in fact ever going to solicit at Tucson International Airport and did not know if others planned to do so. Tapp testified as follows:
(Tr. p. 11)
"Q. Mr. Tapp, you submitted an affidavit or a declaration that you desired to solicit at the Tucson International Airport; is that correct?
A. Yes.
Q. Why haven't you solicited so far up to this date?
A. In Tucson?
Q. Yes, sir.
A. Because the circumstances don't permit it.
Q. What circumstances are you referring to?
A. Well, I talked to the manager and he said it wasn't possible.
* * * * * *
(Tr. p. 17)
Q. (By Mr. Robinson): Do you know who was going to be soliciting at the Tucson International Airport, Mr. Tapp, on behalf of the Krishna Consciousness religion?
A. I don't know for sure, no.
Q. Do you know if you are?
A. I don't know.
* * * * * *
(Tr. p. 18)
Q. Is it possible that you will not solicit at the Tucson International Airport?
A. Yes, it is possible.
Q. Do you have any idea whether you will come, or any other devotee will come to the Tucson International Airport to solicit funds should the terminal building be open?
A. No."

The Threshold Question
Without a "case" or "controversy" prescribed by Article III of the Constitution in defining the judicial power,[4] we are without power to act in the premises. Babbitt v. U.F.W., 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) states:
"* * * The basic inquiry is whether the `conflicting contentions of the parties . . . present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.' Railway Mail Association v. Crosi, 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945); see Evers v. Dwyer, 358 U.S. 202, 203, 79 S.Ct. 178, 179, 3 L.Ed.2d 222 (1958); Maryland Casualty Co. v. Pacific Coal & Oil Co. [312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941)], supra.

A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. O'Shea v. Littleton, 414 U.S. 488, 493, 94 S.Ct. 669, 674, 38 L.Ed.2d 674 (1974). But `[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.' Pennsylvania *379 v. West Virginia, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923); see Regional Rail Reorganization Act Cases, 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974); Pierce v. Society of Sisters, 268 U.S. 510, 526, 45 S.Ct. 571, 574, 69 L.Ed. 1070 (1925).
When contesting the constitutionality of a criminal statute, `it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.' Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974); see Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); Evers v. Dwyer, supra, [358 U.S.] at 204, 79 S.Ct., at 179. When the plaintiff has alleged an intention to engage in a course of conduct, arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he `should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973). But `persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs.' Younger v. Harris, 401 U.S. 37, 42, 91 S.Ct. 746, 749, 27 L.Ed.2d 669 (1971); Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). When plaintiffs `do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court. Younger v. Harris, supra, [401 U.S.] at 42, 91 S.Ct., at 749." [99 S.Ct. 2308-09]
We have refrained from discussing ISKCON v. Eaves, 601 F.2d 809 (5th Cir. 1979), cited and quoted by the parties, since, with due deference, we do not agree either with its novel interpretation of the "case and controversy" constitutional requirement or its analysis of this limitation of judicial power as a "notably amorphous notion."
The difference between a case or controversy, or an abstract question as Mr. Justice White states, "is one of degree of course and is not discernible by any precise test," doesn't mean to us that it is amorphous, any more than many legal terms that courts and juries have been living with these many years. As Judge Learned Hand said:
"* * * we are often faced with indeterminate and indeterminable standards; reasonable notice, reasonable cause, gross negligence, the requisite proof in fraud or in a criminal prosecution. Much of life depends upon such choices * * *." Ford Motor Co. v. Ryan, 182 F.2d 329, 332 (2nd Cir. 1950).
We start, therefore, in our inquiry of "a real substantial controversy," with the uncontested fact that plaintiff Tapp is a devotee of ISKCON, a religion,[5] which has as one of its practices or precepts that he should practice Sankirtan, and the fact that he was told by the Tucson Airport Authority, an agency of the State of Arizona,[6] that he or his movement would be permitted to solicit only in areas adjacent to the Airport terminal building.
The basic inquiry, therefore, is not whether the complaint presents a "case" or "controversy", but whether the proof at the *380 hearing on November 4, 1978 presents a "real substantial controversy between parties having adverse legal interests, a dispute definite and concrete."
Has the plaintiff Tapp demonstrated a realistic danger of sustaining a direct injury as a result of the Airport's refusal to permit him or his movement to solicit inside the terminal?
In the first place, we are not dealing with a criminal statute, or a city ordinance, or an arrest, or a prior arrest, or even a threat of an arrest, or with any action or statement by a prosecutor or a policeman. In fact, no one but God knows if Tapp will ever come to Tucson or its airportat least Tapp said he didn't know if he would or could. The Rules and Regulations of the airport say not a word about soliciting, or arrest, or penalties. In sum, we have a feeling of being alone in a vacuous lawsuit. It is not a case or controversy.
Even if we assume that Broman, as manager of the Tucson International Airport, threatened Tapp with arrest and prosecution if he solicited on behalf of his religion within the terminal building, as counsel for defendant Enz suggested as a finding of fact, that would not be enough to make this lawsuit a case or controversy. It is far from credible that a man making a telephone call from San Diego to Tucson, as Tapp did, would be seized with fear of being arrested and prosecuted in another state for some undisclosed crime, particularly when he himself was uncertain of ever coming to Tucson. There must be a credible threat of prosecution under some statutory wrong. Here there was no statute, or ordinance, or any act or statement by a prosecutor or law enforcement officer. Cf., Rincon Band of Mission Indians v. County of San Diego, 495 F.2d 1, 4-6 (9th Cir.), cert. denied, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283; Ricci v. Riverside County, 419 U.S. 1022, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974).
Assuming that we are in error and that we do have jurisdiction of a case or controversy, nevertheless we should not exercise our equity jurisdiction by enjoining a threat of a criminal prosecution in a state court. This precept we have from a great Chief Justice and an unanimous Supreme Court in a case decided the same day by the same court that decided the famous Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), namely, Chief Justice Stone in Douglas, et al. v. City of Jeannette, et al., 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).
In Jeannette there was a city ordinance prohibiting solicitation of merchandise without a license and the payment of tax the same ordinance held to be unconstitutional in Murdock. In Jeannette there was proof at the trial level that other Jehovah Witnesses had been prosecuted for a violation of the same statute. The Chief Justice, acknowledging that although the District Court had jurisdiction as a federal court, it should never have exercised its equity powers "to interfere by injunction with threatened criminal prosecution in a state court." The Supreme Court held:
"It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction. Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury `both great and immediate.'
The trial court found that respondents had prosecuted certain of petitioners and *381 other Jehovah's Witnesses for distributing the literature described in the complaint without having obtained the license required by the ordinance, and had declared their intention further to enforce the ordinance against petitioners and other Jehovah's Witnesses. But the court made no finding of threatened irreparable injury to petitioners or others, and we cannot say that the declared intention to institute other prosecutions is sufficient to establish irreparable injury in the circumstances of this case." At 163-64, 63 S.Ct. at 881. (Citations omitted)
Accordingly, the plaintiffs' motion for an interlocutory injunction is denied on the merits and the complaint is dismissed for lack of jurisdiction.
Let this Memorandum stand as our findings of fact and conclusions of law pursuant to F.R.Civ.P. 52.
NOTES
[1] The "new" law referred to was not cited but is 28 U.S.C. § 1746. The parties' agreement resolved the conflict, if any, with Rule 603 Fed.R.Evid. and Rule 43(a) F.R.Civ.P.
[2] Broman didn't think it was Tapp who called, and also fixed the time as a month or two earlier. (See Broman's testimony, infra.)
[3] Enz never testified.
[4] The declaratory judgment remedy, 28 U.S.C. § 2201, also requires "a case of actual controversy."
[5] Neither defendant has raised a question as to the propriety of International Society for Krishna Consciousness being a party plaintiff with the capacity to sue. However, we are concerned, since we are satisfied that it lacks capacity to sue as defined in Rule 17(b) F.R.Civ.P. In answer to interrogatories, plaintiffs have admitted that ISKCON is the name given to a denomination of the Krishna Consciousness religion. Therefore, being a religion, it has no capacity to sue.
[6] The realty and improvements at Tucson International Airport are owned by the City of Tucson. Pursuant to Arizona statutes, the City leases the premises to Tucson Airport Authority, a non-profit corporation, which manages and operates the airport. A.R.S. 2-310, 2-311, 2-312. See Hertz Driv-Ur-Self System v. Tucson Airport Authority, 81 Ariz. 80, 299 P.2d 1071 (1956). Tucson Airport Authority is performing an essential government function as an agency of the city or state. A.R.S. 2-312(A).