IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**NEPTUNE SWIMMING FOUNDATION,**
*Plaintiff/Appellant,*

*v.*

**CITY OF SCOTTSDALE,**
*Defendant/Appellee.*

———————

No. CV-23-0076-PR
**Filed February 6, 2024**

———————

Appeal from the Superior Court in Maricopa County
The Honorable Joseph P. Mikitish, Judge
No. CV2019-007172

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

———————

Memorandum Decision of the Court of Appeals, Division One
1 CA-CV 21-0053
Filed March 9, 2023

**VACATED**

———————

COUNSEL:

Timothy Sandefur, Jonathan Riches (argued), Scott Day Freeman, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix; Dennis L. Hall, Dennis L. Hall, Attorney PLLC, Scottsdale, Attorneys for Neptune Swimming Foundation

Scot L. Claus (argued), Vail C. Cloar, Holly M. Zoe, Alexandra Crandall, Dickinson Wright PLLC, Phoenix; Eric C. Anderson, Scottsdale City Attorney's Office, Scottsdale, Attorneys for City of Scottsdale

Kory Langhofer, Thomas Basile, Statecraft PLLC, Phoenix, Attorneys for Amicus Curiae Arizona Free Enterprise Club and Grand Canyon Legal Center

Joshua Bendor, Alexander W. Samuels, Luci D. Davis, Office of the Attorney General, Attorneys for Amicus Curiae State of Arizona

Linley Wilson, Arizona House of Representatives; Rusty Crandell, Arizona State Senate, Phoenix, Attorneys for Amici Curiae Speaker of the Arizona House of Representatives Ben Toma and President of the Arizona State Senate Warren Petersen on Behalf of the 56th Arizona Legislature

————————————

VICE CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL and JUSTICES BOLICK, LOPEZ, BEENE, MONTGOMERY, and KING joined.

————————————

VICE CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1 This case involves private swim clubs vying for exclusive rights to use the City of Scottsdale's (the "City") four public aquatic centers to operate competitive youth swimming programs. To decide whether Scottsdale Aquatic Club ("SAC") or Neptune Swimming Foundation ("Neptune") should receive an operating license commencing in 2019, the City used a request-for-proposal ("RFP") process outlined in its procurement code. It later canceled the RFP after evaluating the clubs' proposals and declined to award a license to Neptune, which had submitted the proposal most financially lucrative to the City. Instead, the City exercised an option to extend an existing license agreement with SAC, which had operated programs at the centers for over fifty years.

¶2 We are asked two questions. First, did the court of appeals err in holding that a qualified bid from the higher bidder should not be considered when deciding whether the City violated article 9, section 7 of the Arizona Constitution (the "Gift Clause")? Second, did the City fail to follow its own rules by canceling the RFP and therefore abuse its discretion

2

in deciding which club should be awarded the license?   As to the first question, we answer that the higher bid in the RFP process was relevant, but not conclusive, in determining the fair market value of the license.   A public entity does not necessarily violate the Gift Clause by choosing the less profitable arrangement.   As to the second question, we find that an issue of material fact exists about whether the City violated its own procurement process, thereby precluding summary judgment for the City on that issue.

## BACKGROUND

¶3        The City provides recreational facilities and programs "believing that the provision of leisure . . . is necessary to meet significant social, physical, informational and mental health needs of the community." Scottsdale Revised Code, ch. 20, art. IV, div. 1, § 20-51(a).   To that end, the City allows open public swimming at its aquatic centers, provides recreational and learn-to-swim programs for all ages, and rents remaining pool time to outside groups, charging fees to offset costs rather than to maximize profit.   The Scottsdale City Council (the "City Council") establishes fees and rental rates for using its parks and recreational facilities, including the aquatic centers.   Scottsdale Revised Code, ch. 20, art. IV, div. 1, § 20-52(a).

¶4        From 1966 until 2016, the City and SAC, a non-profit corporation, entered into annual agreements, which granted SAC exclusive rights to conduct a competitive youth swimming program at the City's aquatic centers.   From at least 2006, Neptune unsuccessfully sought to replace SAC in operating this program.

¶5        The events culminating in this lawsuit started on July 1, 2016, when the City and SAC entered into a revocable license agreement (the "2016 License") for three years with two, one-year options to extend the license term.   Under that agreement, SAC agreed to (1) "support, promote, operate and administer" a competitive youth swimming team for City youth and provide swimming competitions sanctioned by USA Swimming, Inc.; (2) pay hourly rates unilaterally set by the City Council to use pool lap lanes ($3.00 per hour for short-course lanes and $7.00 per hour for long-course lanes), as adjusted from time to time by the City Council; (3) pay other fees, including rental fees for office and storage space; and (4) assist the City with its summer recreational swimming programs.   In return, the City gave SAC access to the aquatic centers when pool space was

not being used for other City programs. The City could unilaterally increase or decrease SAC's usage hours and schedule other public activities during the same hours.

**¶6** The City provided the 2016 License because it wanted to offer a competitive youth swimming team "for the benefit of City residents, in the most economical and efficient manner," and SAC could achieve that goal by operating a team "sponsored by the City" and by providing competitions. Because the City desired "to provide recreational opportunities for residents," it required SAC to primarily train and coach City residents and encourage their participation by implementing tactics like reducing participation fees. The 2016 License acknowledged that SAC's operation would "foster the development of the youth of the City, promote the development of competitive swimming skills and bring national and international visitors to the City for multiple day periods when attending competitions, which encourages shopping, eating and staying in the City."

**¶7** More than one year later, on August 8, 2017, Neptune objected to the 2016 License. Neptune complained that the 2016 License was granted "at significantly below market rates and without compliance with open bidding" in violation of the Gift Clause.[1] Consequently, Neptune demanded that the City rescind the 2016 License and use an open bidding process to determine which club should be granted the exclusive right to use the aquatic centers to conduct a competitive youth swimming program.

**¶8** The City defended its decision to grant SAC the 2016 License. Nevertheless, to give other groups like Neptune an opportunity to obtain access when the 2016 License's initial term expired in 2019, the City initiated a procurement process.

**¶9** In early 2018, the City issued the RFP, inviting non-profit organizations to submit sealed proposals "for an Established Aquatic Youth Competitive Swim Team." The RFP sought proposals for a three-year

---

[1] Neptune also asserted that the 2016 License might violate the Scottsdale City Charter's Gift Clause. *See* Scottsdale City Charter, art. 1, § 3(O). Because Neptune did not pursue that argument with the City or in the courts, we do not mention it further.

contract with two, one-year extension options; set out proposal specifications; and provided that the procurement process would comply with the ordinances, rules, and procedures described in the Scottsdale Procurement Code (the "Code").[2]   Like the 2016 License, the RFP required the winning club to favor City residents and assist the City with recreational swimming events.   The Code required the City to award the license to "the responsible offeror whose proposal is . . . the most advantageous to the [C]ity[,] taking into consideration the evaluation factors set forth in the [RFP]."   *See* City of Scottsdale Procurement Code § 2-188(c)(5) (eff. Feb. 1, 2016) [hereinafter Code].

¶10         The RFP set out proposal components, each of which was assigned a weight for evaluation purposes: firm/organization qualifications (20%); key personnel qualifications (10%); team and facility use/tentative project schedule exceptions (20%); revenue/lap lane hours (30%); membership-residency requirements plan (20%).   For the revenue/lap lane hours component, the RFP required clubs to propose "lap lane fees" of at least $4.00 per hour for short-course-lane use and $8.00 per hour for long-course-lane use and provide the anticipated number of lane hours to be used annually.   The City required the winning club to use at least 25,000 lane hours per year.

¶11         The RFP also required the winning club to maintain between 300 and 550 team members, mostly comprised of City residents or students attending schools within the City's public school system (collectively, "Residents").   The club was required to charge discounted club fees for Residents and pay the City at least $60 per non-Resident swimmer.   The City would deposit all fees into a fund used to maintain and repair aquatic facilities.

¶12         Only Neptune and SAC submitted proposals.   As relevant here, Neptune offered to pay $12 per hour for 32,000 hours of short-course-lane use and 3,000 hours for long-course-lane use.   It also offered to pay $120 per non-Resident participant and estimated 150 such participants.   Neptune's proposal would have netted the City $438,000 in annual revenue.   SAC offered to pay the RFP minimum rates of $4.00 per

---

[2]   The Scottsdale Procurement Code is codified at Scottsdale Revised Code, ch. 2, art. IV, div. 4, §§ 2-180 to 2-219.   It contains adopted ordinances, implementing rules, and approved procedures.   *See id.*

hour for 33,100 hours of short-course-lane use and $8 per hour for 1,120 hours of long-course-lane use. It also offered to pay the RFP minimum of $60 per non-Resident participant and estimated 200 such participants. SAC's proposal would have netted the City $153,360 in annual revenue. Together with other fixed fees, Neptune offered to pay $284,640 more per year than SAC in the revenue component of the RFP.

¶13　　The City established a committee comprised of three City employees (the "Committee") to evaluate and score the proposals on all components, except expected revenue. The City's purchasing department separately evaluated and scored the expected-revenue component. Both the Committee and the purchasing department assigned points on a scale from one to five, with five being the highest. After all points were added, SAC's proposal scored 31.75 more points than Neptune's proposal. Thus, the City's purchasing department recommended SAC's proposal, and on March 26, the City announced it intended to award SAC the license on April 3.

¶14　　On March 30, Neptune formally protested the RFP results pursuant to the Code § 2-213, claiming a suspected Gift Clause violation. It asked the City to delay awarding the license and undertake an additional review. A few days later, on April 3, Neptune asked for a hearing pursuant to the Code § 2-212 and submitted a formal public records request for all documents relating to the RFP.

¶15　　The City dismissed the protest on April 5 pursuant to the Code R2-213.3, stating Neptune could only challenge the award based on a violation of the Code, and no violations had occurred. The City concluded SAC was "the most advantageous Contractor" and that the recommended award complied with "all [Code] rules and procedures." In another letter to Neptune that day, the City represented it had handled the protest "in compliance with the City's [Code]." The City separately provided Neptune with the RFP's scoring matrix reflecting the points awarded for each proposal.

¶16　　Neptune discovered that the scoring matrix contained a tabulation error and that Neptune had actually received 0.75 more total points than SAC. Therefore, on April 6, Neptune informed the City of the error and asserted that the City should award Neptune the license.

¶17            Prompted by Neptune's protest, an assistant City manager examined the RFP process.   He agreed that a scoring error had occurred, "result[ing] in a virtual tie between Neptune and SAC based on pure arithmetical scoring."    The manager also indicated he had found anomalies in the RFP process, including the RFP's failure to clarify whether the per-lane hourly fee included City staff time charges.   Notably, he expressed concern whether "using revenue as the primary factor in determining the award could result in significant fee increases for swimmers without going through a public process," like the City Council's annual fee-setting process.   He also questioned whether one club's lap-lane use estimate (presumably, Neptune's estimate) was realistic in light of the historic availability of lane hours.   For all these reasons, he decided the Committee should interview Neptune and SAC and then make a new recommendation for awarding the license.   The City therefore asked Neptune and SAC to make presentations.

¶18            Both Neptune and SAC declined the City's request. Neptune maintained it should be awarded the license as the successful bidder under the RFP process.   SAC acknowledged the Committee's tabulation error but asserted that the corrected total still showed that SAC scored higher than Neptune.   SAC also asserted that "a further analysis of points would be rendered moot by the fact that Neptune cannot qualify as a responsive or responsible bidder."

¶19            On May 11, the City canceled the RFP and rescinded its previous notice of intent to award SAC the license.   For the first time, the City stated that because it was not "purchasing materials, services or construction" and competitive youth swimming "is not a City-mandated or City-sponsored program," the Code did not govern the licensing proceedings.   Instead, the City asserted that the Code served as a "guide" for determining which proposal was most advantageous to the City. Consequently, it rejected Neptune's arguments that the Code required the City to award Neptune the license.   The City concluded that canceling the RFP would be in its best interests.

¶20            About eleven months later, on April 8, 2019, before the 2016 License issued to SAC was set to expire, the City exercised the option to extend that license for an additional year.   Soon thereafter, the City set per-hour lane fees at $4.00 for short-course lanes and $8.00 for long-course lanes, subject to future revision by the City Council.   The City set those fees after "benchmarking" fees charged by other Arizona cities for pool use

by sponsored or partnered teams, although the comparisons were not perfect because the cities had different populations, were located in different parts of the state, and had different fee schemes.

**¶21** Neptune filed this lawsuit claiming the City violated the Code by not awarding the license to the most advantageous proposer. It alternatively claimed the City violated the Gift Clause by awarding SAC the 2016 License at below-market rates. Neptune sought to invalidate the 2016 License and compel the City to grant Neptune a license as the successful proposer under the RFP. Alternatively, Neptune sought declaratory relief. The superior court ultimately granted summary judgment for the City, and the court of appeals affirmed. *Neptune Swimming Found. v. City of Scottsdale*, No. 1 CA-CV 21-0053, 2023 WL 2418546 (Ariz. App. Mar. 9, 2023) (mem. decision).

**¶22** We accepted review of Neptune's subsequently filed petition for review. Although the matter is moot because any license awarded under the RFP would have expired, and the 2016 License has been fully performed, we nevertheless address Neptune's challenge because the petition presents questions of great public importance that are likely to recur. *See In re Pima Cnty. Mental Health No. 20200860221*, 255 Ariz. 519, 523–24 ¶ 8 (2023). We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

**¶23** We review the superior court's grant of summary judgment for the City de novo. *Glazer v. State*, 237 Ariz. 160, 167 ¶ 29 (2015). Summary judgment was appropriate if the material facts were not genuinely disputed and the City was entitled to judgment as a matter of law. *See* Ariz. R. Civ. P. 56(a). Also, we review the interpretation and application of the Gift Clause and the Code de novo as issues of law. *See Cheatham v. DiCiccio*, 240 Ariz. 314, 317–18 ¶ 8 (2016), *overruled in part on other grounds by Schires v. Carlat*, 250 Ariz. 371, 378 ¶ 23 (2021); *Rollo v. City of Tempe*, 120 Ariz. 473, 474 (1978).

**A.  Did The Court Of Appeals Err In Holding That Qualified Bids From A Higher Bidder Should Not Be Considered When Deciding Whether The City Violated The Gift Clause?**

### 1.  General Principles

**¶24**        We lay the groundwork for answering this question by describing the Gift Clause and our framework for determining a violation. The Gift Clause provides, in relevant part, that "[n]either the state, nor any county, city, town, municipality, or other subdivision of the state shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation." Ariz. Const. art. 9, § 7.   The provision exists to prevent "depletion of the public treasury or inflation of public debt by a public entity engaging in non-public enterprises . . . or by giving advantages to special interests." *Schires*, 250 Ariz. at 374 ¶ 6 (first quoting *State v. Nw. Mut. Ins. Co.*, 86 Ariz. 50, 53 (1959); then quoting *Wistuber v. Paradise Valley Unified Sch. Dist.*, 141 Ariz. 346, 349 (1984)) (cleaned up).

**¶25**        Our courts use a two-pronged test to determine whether a public entity has violated the Gift Clause.   *See id.* at 374 ¶ 7.   "First, a court asks whether the challenged expenditure serves a public purpose."   *Id.*   If the answer is "no," "the expenditure violates the Gift Clause, and the inquiry ends."   *Id.* at 374–75 ¶ 7.   If the answer is "yes," "the court secondarily asks whether the value to be received by the public is far exceeded by the consideration being paid by the public."   *Id.* at 375 ¶ 7. That inquiry "focuses on what the public is giving and getting from an arrangement and then asks whether the 'give' so far exceeds the 'get' that the government is subsidizing a private venture in violation of the Gift Clause."   *Id.* at 376 ¶ 14.   Thus, courts must identify the "objective fair market value of what the private party has promised to provide" and then determine its proportionality to the public entity's consideration.   *Id.* (quoting *Turken v. Gordon*, 223 Ariz. 342, 350 ¶ 33 (2010)); *accord id.* at 378 ¶ 23.   The party alleging that a public entity violated the Gift Clause bears the burden of proving it.   *See id.* at 375 ¶ 7.

### 2.  Application

**¶26**        Neptune does not contest that the 2016 License serves a public purpose, and we agree.   As the City declared, dedicating parts of the City's aquatic centers for competitive youth swimming enriches the lives of the

City's youth and their families, and it generates tourism dollars for local businesses. *See id.* at 375 ¶ 8 (noting that a public purpose generally "promotes the public welfare or enjoyment"). The 2016 License satisfies prong one of the Gift Clause inquiry.

¶27      The question here concerns the court of appeals' application of the inquiry's second prong, which we call the "consideration prong." Before addressing Neptune's challenge, we briefly address the City's argument that the consideration prong is inapplicable because the 2016 License does not cost the City anything. The City asserts that if an arrangement does not require a public entity to either spend money or forego collecting it, the consideration prong cannot apply as no public "expenditure" exists to measure against the private entity's consideration. In those circumstances, the City maintains, as long as an arrangement serves a public purpose, it does not violate the Gift Clause.

¶28      The consideration prong applies here. An expenditure governed by the Gift Clause is "any donation or grant, by subsidy or otherwise," and is not limited to monetary expenditures or debt forgiveness. *See* Ariz. Const. art. 9, § 7; *accord Ariz. Ctr. L. Pub. Int. v. Hassell*, 172 Ariz. 356, 367 (App. 1991) ("The framers did not restrict their prohibition [in the Gift Clause] to the grant of public money."). Granting a private enterprise exclusive use of City-owned property, even absent a monetary cost to the City, constitutes an expenditure for Gift Clause purposes. *See Schires*, 250 Ariz. at 376 ¶ 14 ("The state may not give away public property . . . ." (quoting *Yeazell v. Copins*, 98 Ariz. 109, 112 (1965))); *City of Tempe v. Pilot Props., Inc.*, 22 Ariz. App. 356, 362–63 (1974) (applying the consideration prong to a long-term lease of public property for use as a major league spring training complex).

¶29      Contrary to the City's argument, such arrangements are not like the tax credit challenged under the Gift Clause in *Kotterman v. Killian*, 193 Ariz. 273 (1999). There, the Court reasoned that because the state does not own untaxed taxpayer income, foregoing collecting some of that income by applying the credit could not be a "gift." *See id.* at 288 ¶ 52. Here, the City owns the property access rights granted by the 2016 License, and we can determine the proportionality of the consideration given and received by the City for those rights. *See Pilot Props.*, 22 Ariz. App. at 363.

¶30            We now address whether the court of appeals properly applied the consideration prong.   The court found that Neptune's willingness to pay more for a license than SAC in the RFP process was irrelevant in determining the objective fair market value of what SAC provided under the 2016 License because Neptune's offer concerned a "failed RFP process resulting in no agreement."  *See Neptune Swimming Found.*, 2023 WL 2418546 at *5–6 ¶¶ 32–35.   The court instead examined the 2016 License in isolation and concluded that the fees charged by other cities for similar licenses provided sufficient evidence for the superior court to determine as a matter of law that the City's "give" did not far exceed its "get."  *See id.* at 6 ¶¶ 35–36.

¶31            Neptune argues that the court of appeals erred because competitive bidding establishes fair market value by demonstrating what a knowledgeable, willing party would pay for a license in an arm's-length transaction.   It contends that if the court of appeals had properly considered Neptune's bid, the court should have valued the license at $284,640 more per year than what the City charged SAC, thus demonstrating that the City's "give" far exceeded its "get."

¶32            As the court of appeals correctly found, the consideration prong focuses on the challenged arrangement alone and does not ask the court to consider whether the public entity could have made a better deal. *See id.* at *5 ¶ 32.   Thus, whether the City could have entered into a more financially profitable arrangement with Neptune does not resolve whether the "give" and the "get" from the 2016 License were grossly disproportionate.   *See Schires*, 250 Ariz. at 376 ¶¶ 13–14.   As amicus State of Arizona correctly stated, the Gift Clause "is simply a check on the proportionality of the deal that was chosen."

¶33            Nevertheless, we agree with Neptune that its failed competitive bid is relevant to determining the objective fair market value of what SAC promised to provide under the 2016 License.   Neptune's bid reflects what one qualified organization was willing to pay for a substantially similar license.  *See Bus. Realty of Ariz., Inc. v. Maricopa County*, 181 Ariz. 551, 553 (1995) (defining fair market value as "that 'amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts'" (quoting *Fair Market Value*, Black's Law Dictionary (6th ed. 1990))); *see also* Appraisal Institute, *The Appraisal of Real Estate* 341 (15th ed. 2020) ("In addition to

recorded sales and signed contracts, appraisers may consider offers to sell (listings) and offers to purchase."); *London Bridge Resort, Inc. v. Mohave County*, 200 Ariz. 462, 464 ¶ 6 (App. 2001) (stating courts generally use an appraisal approach to determine the fair market value of property).

¶34        But Neptune's willingness to pay higher fees for a license does not conclusively establish the fair market value of SAC's performance under the 2016 License.    First, nonpecuniary benefits also count as consideration.    *See Kromko v. Ariz. Bd. of Regents*, 149 Ariz. 319, 322 (1986) (stating that although perpetuating an educational relationship between a hospital and a university's medical school is nonpecuniary, "it nonetheless may be viewed as consideration" for Gift Clause purposes).    Here, collecting user fees was not the primary public benefit from the 2016 License.    Rather, the primary benefit was SAC running a competitive youth swimming program for the City "in an economical and efficient manner," which would maximize Resident participation and enjoyment. The highest bid for a license might not be "the most advantageous" for the City to realize this benefit.    For example, the City might reasonably favor lower lap-lane fees to encourage a club to charge lower membership fees to Residents, thereby increasing patronage.    Indeed, the City's 2017 schedule of program charges, rental fees, and fines reflected lower fees for individual Residents and for commercial youth programs operating at City recreational facilities as compared to fees charged to other users. Therefore, perhaps counterintuitively, an arrangement with the most value could be one that produces less revenue for the City.

¶35        Second, the Gift Clause does not require public entities to maximize profit at the cost of other considerations.    Through the 2016 License, the City contracted with a private enterprise to provide public recreational services.    This was unlike a sale of property to the highest bidder or a contract to build a facility awarded to the lowest qualified bidder.    An agreement to provide recreational services to the public concerns more than revenue production.    For example, in addition to keeping fees low for the public, the City might legitimately favor a club that proposes fewer lap-lane usage hours to ensure sufficient time at the aquatic centers for other City recreational programs and open swimming time.

¶36        In short, the Gift Clause does not prevent a public entity from considering nonpecuniary factors in deciding what arrangement terms are most advantageous, even if more financially profitable deals exist.    The Gift Clause is triggered only when the chosen arrangement either serves no

public purpose or the public is disproportionately short-changed.  *See Schires*, 250 Ariz. at 374–75 ¶ 7.

¶37        On this record, Neptune failed to prove that the City's "give" was "grossly disproportionate" to its "get" under the 2016 License.  *See id.* at 376 ¶¶ 13–14.  The City gave SAC limited, exclusive use of its aquatic centers in return for SAC running a competitive youth swimming program for Residents, assisting the City with operating its own recreational swimming programs, and paying user fees.  The user fees were set after benchmarking fees charged by other Arizona cities for comparable uses.

¶38        Although Neptune offered to pay higher fees to provide substantially the same services and on the same terms, that evidence alone does not necessarily establish disproportionality.  Because the City never accepted Neptune's bid, the higher offer is simply evidence of what Neptune was willing to pay.  *See The Appraisal of Real Estate* 341 ("[O]ffers generally provide less reliable data than signed contracts and completed sales because they represent what a buyer was willing to pay rather than the price both a buyer and seller were willing to agree to consummate a sale.").  And, as explained, the objective fair market value of SAC's promised performance under the 2016 License involved nonpecuniary factors that minimized the importance of user fees.  Notably, in the failed RFP, Neptune scored less than a point higher than SAC even though Neptune's proposal was much more lucrative, evidencing the value of nonpecuniary factors.  Thus, even if Neptune's proposal was the better financial choice for the City, the proposal did not establish that what the City gave far exceeded what it got from the 2016 License.

¶39        Finally, Neptune points out that, because the City charges other commercial users $10 per hour for short-course lap lanes and $23 per hour for long-course lap lanes, the user fees charged to SAC under the 2016 License are grossly disproportionate to the usage value.  But this is an apples-to-oranges comparison.  Commercial use for corporate parties and the like concerns only pool space rental for private purposes.  As explained, the 2016 License enables a sponsored team to bring competitive swimming to the City and charge lower fees to Residents, thus maximizing the number of Residents who wish to participate.  Lower lap-lane fees for SAC are also justified by its commitment to using the lanes for thousands of hours and its obligation to assist the City with recreational swimming programs.

¶40　　　　In sum, the Gift Clause serves to check mismanagement of public resources, but it does not require a public entity to maximize profits in every transaction.　In applying the consideration prong of the Gift Clause inquiry, courts may consider unsuccessful offers and canceled bids in identifying fair market value.　But here, Neptune's failed bid was not sufficient to prove that what the City gave in the 2016 License far exceeded what it received in return.　The superior court therefore correctly entered summary judgment for the City on Neptune's Gift Clause claim.

**B.　Did The City Fail To Follow Its Own Rules By Canceling The RFP And Therefore Abuse Its Discretion In Deciding Which Club Should Be Awarded The License?**

¶41　　　　Neptune argues the City failed to perform a nondiscretionary, ministerial act.　Alternately, Neptune argues the City acted arbitrarily and abused its discretion by failing to follow the Code and award Neptune the license as the most advantageous bidder.　It therefore asserts it was entitled to mandamus relief.　The City responds it did not violate the Code by canceling the RFP and then extending the 2016 License.[3]　The court of appeals agreed with the City.　*See Neptune Swimming Found.*, 2023 WL 2418546 at *3 ¶ 18, *4 ¶ 26.

¶42　　　　We disagree with Neptune that after the City determined Neptune had scored the most points under the RFP, the City had a ministerial duty to award a license to Neptune.　Neptune relies on *City of Phoenix v. Wittman Contracting Co.*, 20 Ariz. App. 1, 2 (1973), wherein a contractor sought to enjoin the City of Phoenix from awarding a public works project to a competing bidder.　The court concluded that once the city determined that the contract should go to the lowest bidder, the city completed the exercise of its discretion.　*Id.* at 5.　If the bidders were qualified, the city did not retain discretion to choose the lowest bidder because that was "a question of pure mathematics."　*Id.*　According to the court, the city had a ministerial duty to award the contract to the lowest bidder, and its failure to do so there was arbitrary and capricious.　*Id.* at 6.

---

[3]　The City initially argued the Code, by its terms, did not apply to the RFP. *See Neptune Swimming Found.*, 2023 WL 2418546 at *3 ¶ 18.　At oral argument here, the City conceded it was bound by the Code because the RFP represented the City would follow the Code in the RFP process.

¶43        This case is distinguishable from *Wittman Contracting* because the City never determined that the license must be awarded to the club that scored the most evaluation points or proposed the most financially lucrative arrangement.   It is useful to consider the difference between an invitation for bids, as occurred in *Wittman Contracting*, and a request for proposal, like the one here.   An invitation for bids sets out "all contractual terms and conditions applicable to the procurement," *see* Code § 2-188(b), and requires the City to award the contract "to the lowest responsible and responsive bidder," *see id.* § 2-188(b)(5).   A request for proposal results in a contract based on "price and other evaluation factors."   *See id.* § 2-188(c)(3).   The City must award the contract to the party whose proposal is "the most advantageous to the city taking into consideration the evaluation factors set forth in the request for proposals."   *See id.* § 2-188(c)(5).

¶44        Contrary to a bidding process, the RFP did not require the City to accept the proposal with the most evaluation points or the best financial terms.   The Code only required that the City take the evaluation factors into consideration when deciding which proposal is "most advantageous."   *See id.* § 2-188(c)(5).   Similarly, the RFP provided that the Committee would evaluate proposals using the established evaluation criteria and recommend an award "to the Proposer that best meets the City's needs and provides the best value to the City."   Also, the Committee was empowered to divide responsibilities between proposers if doing so was "most advantageous to the City."   Thus, unlike the city in *Wittman Contracting*, the City here could exercise discretion in choosing the most advantageous award after scoring the proposals.   Awarding a license under the RFP was not "a question of pure mathematics."   *See Wittman Contracting*, 20 Ariz. App. at 5; *see also Hertz Drive-Ur-Self Sys., Inc. v. Tucson Airport Auth.*, 81 Ariz. 80, 85 (1956) (rejecting argument that financial terms in offers should be considered alone rather than in relation to other terms).

¶45        Neptune's argument that the City acted arbitrarily and abused its discretion in canceling the RFP is more persuasive.   *Brown v. City of Phoenix*, 77 Ariz. 368 (1954), is the seminal case here.   In *Brown*, the City of Phoenix was leasing airport space to a single car rental company ("Avis") when a competing company ("Hertz") asked to bid on the lease. *Id.* at 370.   Although initially hesitant because Avis "had been operating satisfactorily," officials eventually opened the lease for bidding at a public auction.   *Id.*   It asked bidders to propose monthly rent as a percentage of gross monthly sales with a guaranteed minimum of $200 per month.   *Id.*

at 370–71.   The charter required the city to award the lease "to the highest responsible bidder at the highest monthly rent," although the city council could "in its discretion reject any and all bids."   *Id.* at 370.   Although Hertz was the highest bidder at the auction, the city awarded the lease to Avis that same day as "the highest and best bid when all factors [were] considered of service and experience of airport operations."   *Id.* at 371.

¶46        In the lawsuit that followed, the superior court found that the city did not act arbitrarily in awarding the lease to Avis and therefore denied Hertz's request for mandamus relief.   *Id.*   On appeal, this Court acknowledged that the city had discretion to decide who was a "responsible bidder" and whether "any and all bids" should be rejected.   *Id.* at 373. But this discretion was not limitless.   *Id.*   The Court pointed out that the charter required the city to accept the highest responsible bid "to benefit the taxpayers and citizens of the city."   *Id.*   Consequently, "officers [e]ntrusted with the public duty in question are not free to act arbitrarily through caprice, favoritism, by collusion, and in bad faith, thereby abusing the discretion reposed in them."   *Id.* (quoting *State ex rel. J. Printing Co. v. Dreyer*, 167 S.W. 1123, 1130 (Mo. App. 1914), *overruled on other grounds by State ex rel. Johnson v. Sevier*, 98 S.W.2d 677 (Mo. 1936)).

¶47        The Court examined the record and concluded that the city had awarded the lease to Avis solely out of favoritism.   *Id.* at 375. Although the city had discretion to award the lease to the less favorable bidder, the Court determined it could only do so after conducting a "due investigation into the facts" and then finding that the award was in the city's best interests.   *Id.*   But comments from city council members and the public works director at the time of the award revealed they favored Avis out of a sense of loyalty because it had performed responsibly in the past.   *Id.* at 374–75.   And the city admitted it had not investigated whether Hertz was responsible, later conceding that the person owning the franchise "could perform the contract and that his personal integrity and business ability are the finest."   *Id.* at 375.   Because the city's decision to award the lease to Avis over Hertz was unjustified, and the record "conclusively indicates a fixed intention to award the lease in question to [Avis]," the Court reversed and instructed the superior court to issue a judgment directing the lease award to Hertz.   *Id.* at 377.

¶48        Neptune argues that like the City of Phoenix in *Brown*, the City favored SAC throughout the RFP process and when Neptune pointed out it had actually scored the most evaluation points, the City acted

arbitrarily by canceling the RFP and extending the 2016 License.   The City highlights other evidence showing it acted properly under the RFP and in the public interest.   We conclude that disputed issues of material fact exist as to whether the City acted with a "fixed intent" to award the license to SAC throughout the RFP process and engaged in favoritism by canceling the RFP after Neptune submitted the more advantageous proposal.

**¶49**        Several anomalies occurred in the RFP process, all of which favored long-time licensee SAC, which could lead a factfinder to reasonably find that the City acted arbitrarily and abused its discretion by canceling the RFP so it could favor SAC by extending the 2016 License.   First, the City incorrectly tabulated the evaluation points, which resulted in the purchasing department recommending SAC for the license.   After Neptune pointed out the error, rather than award it the license, the City instead questioned the RFP terms and asked for presentations.

**¶50**        Second, the City relied on the Code when it worked against Neptune but disavowed the Code when Neptune invoked it.   After SAC was initially awarded the license and Neptune protested, the City rejected the protest as it did not raise an error under the Code.   Yet when Neptune later demanded that the City award the license to Neptune because it, in fact, scored more evaluation points, the City, for the first time, asserted the Code did not apply but served only as a "guide."

**¶51**        Third, questions exist whether canceling the RFP was, in fact, advantageous to the City as required by the Code.   *See* Code R2-193.3(A).  The assistant City manager determined the RFP lacked clarity on whether staff time was included in the per-lane hourly rates only after Neptune was revealed as having the most evaluation points.   Why wasn't that issue raised before the City originally gave notice it intended to award the license to SAC?   Also, although the assistant City manager questioned whether offered lap-lane hours were realistic, nothing shows the City investigated the issue further or even asked Neptune or SAC about it before canceling the RFP.

**¶52**        Fourth, a question exists whether the City passed its deadline for choosing to cancel the RFP after opening the proposals.   The Code authorizes the City to cancel an RFP in that circumstance only if it has not yet made an award.   *See id.*   On the one hand, although the City gave notice of its intent to award the license to SAC, nothing reflects the City formally made the award and it denies doing so.   On the other hand, the

City released the sealed proposals, which the Code authorizes only "[a]fter contract award." *See* Code R2-188.23(D). Thus, absent other facts, the City either improperly canceled the RFP after the award was issued, *see* Code R2-193.3(A), or improperly released sealed bids before an award was issued, *see* Code R2-188.23(D).

**¶53** In sum, disputed issues of material fact exist as to whether the City abused its discretion to act in the public interest by canceling the RFP so the City could favor SAC by extending the 2016 License. Summary judgment was therefore inappropriate on that issue.

**C. Attorney Fees**

**¶54** Neptune asks for fees under the private attorney general doctrine. The private attorney general doctrine grants fees to "a party who has vindicated a right that: (1) benefits a large number of people; (2) requires private enforcement; and (3) is of societal importance." *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 8 ¶ 26 (2013) (quoting *Arnold v. Ariz. Dep't of Health Servs.*, 160 Ariz. 593, 609 (1989) (internal quotation marks omitted)). Because Neptune has not vindicated a right at this stage, we decline its request.

**CONCLUSION**

**¶55** For these reasons, we vacate the court of appeals' decision. We affirm summary judgment on the Gift Clause claim, reverse summary judgment on the procurement code claim, and remand to the superior court for additional proceedings.